**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | | |
| **v.** | : | **1:21-CR-204-BAH** |
| | | |
| **ERIC CHASE TORRENS** | : | |

**DEFENDANT'S SENTENCING MEMORANDUM**

Defendant Eric Chase Torrens ("Mr. Torrens") submits this Memorandum to assist the Court in imposing a reasonable "sentence sufficient, but not greater than necessary" for his conviction of parading, demonstrating, or picketing in a Capitol building, in violation of 40 U.S.C. § 5104(e)(2)(G).[1] Based on the factors set forth in 18 U.S.C. § 3553(a), Mr. Torrens' limited actions, his cooperation with the government, his commendable post-arrest conduct, his unconditional acceptances of responsibility and demonstrated deep feeling of remorse, and his essential role and responsibilities as custodial co-parent of his five-year-old daughter, counsel respectfully recommends and requests that this Court sentence Mr. Torrens to a period of supervised probation, with appropriate conditions, in order to continue his rehabilitation, protect the community, and allow him to re-earn the trust and respect of his family, his community, and himself.[2]

---

[1] The offense is a Class B misdemeanor that meets the definition of a "petty offense." A term of supervised release is inapplicable. The voluntary U.S. Sentencing Guidelines do not apply. PSR ¶¶ 72, 73, 75.

[2] Counsel has communicated with the author of the draft Nonguideline Misdemeanor Presentence Investigation Report ("PSR"), and anticipates no objections to the final PSR.

**DISCUSSION**

**I.     History and Characteristics of the Defendant, Eric Torrens**

Eric Chase Torrens is twenty-eight years old. He grew up in immigrant family in the Tampa, Florida area.[3] There, he graduated from high school in 2011 and briefly attended a local community college.[4] Higher education was a poor fit for him. He entered the workforce.

While still in Florida, Mr. Torrens entered a relationship with S.B.[5] Together the two of them had a child. V.[6] She is about to turn 6 years old. Both Mr. Torrens and S.B. had limited employment prospects in Florida. They decided to move. Mr. Torrens' cousin helped him get a job at a heating and cooling business where his cousin worked, and they moved to Gallatin, Tennessee in late 2016.[7] Once in Gallatin, Mr. Torrens obtained a full-time job in a warehouse with Gap, Inc.[8] He worked there for three years, before changing to a less physically and intellectually monotonous job at Walmart, where he worked for a year. He lost that job when his participation in the January 6 Capitol event was publicized.[9] Out of work for about three weeks, Mr. Torrens obtained a new job on February 22, 2021 and has maintained that employment.[10] His position is a Team Leader at MPack Solutions.[11] His supervisor has written a letter of support: "[Eric] regularly manages 5-10 people. . . Eric has always dealt with people kindly and

---

[3] Mr. Torrens is Hispanic/Latino.

[4] PSR ¶ 51.

[5] Counsel uses initials to protect her privacy in this public filing. Her full name is at PSR ¶ 41.

[6] Counsel uses the first initial to protect the child's privacy. Her full name is at PSR ¶ 41. Counsel also redacts her name in the letters attached as exhibits.

[7] PSR ¶ 57.

[8] PSR ¶ 56.

[9] PSR ¶ 55.

[10] Hired through a temp organization, his employer provides a letter of verification and support, *see* Letter, Ashley McLemore, All-Star Personnel (Aug. 20, 2021) (Exhibit 2), and the PSR verified current employment.

[11] PSR ¶ 54.

given everyone under him many chances to succeed."[12] His supervisor continues, "I have never

heard Eric make light of the situation or his involvement, all I have personally seen from him is

remorse."[13]

Mr. Torrens and S.B. separated in January 2019. In 2019, V. primarily lived with her mother;

Mr. Torrens had slightly less than 1/3 time with V. In December 2019, Mr. Torrens filed a *pro se*

petition for joint custody of V. S.B., represented by family law counsel, fought joint custody. In

October 2020, S.B. sought court permission to relocate with V. from Tennessee to the state of

Washington. Mr. Torrens obtained counsel. On July 21, 2021, after a three-day trial, the family

court ordered that Mr. Torrens and S.B. would share 50/50 joint custody of V. in Tennessee.[14]

The court order sets a week-on-week-off parenting schedule from Sunday at 6:00 p.m. until the

following Sunday at 6:00 p.m. Because V. had seen both her mother and father almost every day

of her life, the family court judge also ordered each parent to have midweek overnight visits,

with pickup from school on Wednesday until the following morning at school drop-off. The

court established a vacation schedule. There is family court review in December 2021.

---

[12] Letter, Austin Gregory, Production Manager, Mpack Solutions (undated) at 1 (Exhibit 3).
[13] *Id.* at 2.
[14] The pre-sentence report writer was provided with the 16-page Final Order and its attachments. *See* PSR ¶ 42.





Mr. Torrens' daughter is unquestionably the most important part of his life. "This is his only child whom he loves dearly, and now lives just for, my only granddaughter. Eric revolves everything around her life."[15] "Nothing has brought me more joy than watching Eric care for and love is daughter, V[]. She is the best thing in his life. **Anytime he speaks of her, he just lights up**. . . . Eric is a wonderful father who works very hard to provide for his daughter."[16]

---

[15] Letter, Eric Torrens, Father of the Defendant (undated) at 1 (Exhibit 4); Letter of Jacqueline Torrens, Defendant's Mother (undated) ("My son is a kind, loving, and caring person as well as an awesome dad.") (Exhibit 5). Counsel has redacted Ms. Torrens' phone number, which was provided to the PSR writer, from this public filing.

[16] Letter, Taylor Huetz, V.'s Godmother and Defendant's First Cousin (undated) (emphasis added) (Exhibit 7). *See* Letter, Marline Suarez, Defendant's Paternal Aunt and Godmother

Together with following all court obligations in this case, Mr. Torrens' primary emphases this past year was to ensure his daughter's mom did not take V. out of the state and to establish joint custody. Mr. Torrens fully co-parents and cares for his daughter. He gets her ready for the day. He takes her to school and picks her up. He makes V.'s meals and shares them together. He makes sure she is healthy and safe. They go for walks in the neighborhood and visit playgrounds, parks, and nature. They work in the garden together. By all accounts – even it appears by his ex-girlfriend[17] – Mr. Torrens is a loving, committed, and excellent father. V. is growing and maturing due to the mature manner in which he and her mother put aside differences between them to focus on her needs and care.

Mr. Torrens became addicted to Percocet about five years ago, and the stress of his custody case and this case has caused him great anxiety. He did not want to relapse; and, therefore, earlier this year, he obtained a prescription for suboxone from, and proactively sought counseling and treatment at, an addiction treatment center.[18] Mr. Torrens has no positive urine tests. The presentence report writer recommends substance abuse testing as a specific condition of any supervision given his substance abuse history.[19]

---

(undated) ("V. is his pride and joy. The best thing he's ever one in life was to become a father. []
In seeing first hand his interactions with his daughter, I can attest that I was so proud to witness
what an attentive, empathetic and loving father he is.") (Exhibit 8); Letter, Caroline Dumas,
Family Friend (Oct. 7, 2021) ("I could see him teaching while playing and having so much fun. I
knew he was a special dad but this was unusual.") (Exhibit 9).
[17] PSR ¶ 41.
[18] PSR ¶¶ 49, 50.
[19] PSR ¶ 77.

Mr. Torrens has **no prior criminal record**.[20] This is his very first arrest. Family members and friends describe him as a law-abiding person and considerate father, son, friend, employee, and neighbor.[21]

Both undersigned counsel and Mr. Torrens' family attorney observe Mr. Torrens to be quiet, reserved, almost shy, and seemingly even less emotionally mature, more emotionally pliable than his years of 28. Counsel writes this not to be critical of Mr. Torrens. We naturally grown in maturity, wisdom, and self-regard as we age and experience different life events. Indeed, this event has been a searing experience from which Mr. Torrens has been forced to learn much.

## II.    Nature and Circumstances of the Offense

In January of this year, Mr. Torrens was working at Walmart. There, he became friends with "Juan," who is co-defendant Jack Griffith. Mr. Griffith is a dynamic, voluble, and charismatic person. Mr. Griffith and Mr. Torrens shared support for President Trump in the 2020 election. Both Mr. Griffith and Mr. Torrens shared support of President Trump after the 2020 election, as the then-President and his supporters pressed a false disinformation campaign that the election was stolen and that Mr. Trump should remain in the White House for the next four years. President Trump announced that he was going to speak at a rally on the Ellipse on January 6, 2021 in Washington, D.C. Mr. Torrens had never before been to Washington, D.C. Mr. Griffith

---

[20] PSR ¶¶ 31, 32.

[21] See, e.g., the letter from Brandy Eddings, his neighbor and the single mother of three children. She writes that Mr. Torrens "has been a Godsend. There are many days that I am without transportation. Eric does not hesitate to assist me." Letter of Brandy Eddings (undated) at 1-2 (Exhibit 10). She also confirms Mr. Torrens' loving relationship with V. – Her daughter and V. play together, and she sees Mr. Torrens' gardening, going for walks, and visiting the pool with V. *Id.* at 2. Many 20-somethings fail at the respect and politeness that earlier generations follow. But Mr. Torrens understands being considerate: "I love getting pictures of the two of them together. I've asked Eric to send me pictures and he does." Caroline Dumas, *supra* note 16 (Exhibit 9).

suggested that Mr. Torrens drive them to President Trump's rally together. To Mr. Torrens, it seemed like a fun trip to give his support to President Trump.

Mr. Torrens and Mr. Griffith arrived on January 5, 2021 to attend the rally. Mr. Torrens had no plan or intent to visit the U.S. Capitol. None. He was here for the rally.

They attended the rally on January 6, 2021. It was exciting. The President and many of his supporters spoke and fired-up the already energized crowd. Mr. Torrens felt the excitement of the crowd and moment. At the conclusion of President Trump's barnburner event, many of the rallygoers made their way down the avenue to the U.S. Capitol. Mr. Griffith wanted to go. Mr. Torrens was indecisive and ambivalent. There were thousands of people in a large city unknown to him. He and Mr. Griffith planned to make the long drive back to Tennessee that night. Mr. Torrens did not want to get separated from Mr. Griffith. The two of them joined the crowd and walked to the Capitol.

At the Capitol, the rally crowd – and others who had come to Washington, D.C. with the expressed intent to protest/demonstrate/agitate/storm/breach/attack the U.S. Capitol and interfere/prevent/disrupt certification of the vote count of the Electoral College – was large, loud, and boisterous. Certain individuals in the crowd pushed past exterior barricades to the building and forced entry into the building. Mr. Torrens was not among that group of people.

Mr. Torrens arrived about 10-15 minutes later. He was on the Capitol grounds outside the Capitol from 2:12 to 2:14. There, Mr. Torrens could see people throwing things at the police and that the police were overwhelmed. Discovery shows that the FBI observed that the was no evidence that Mr. Torrens had any weapons or used any violence. Further, the FBI concluded,

"No photos/videos evidence Torrens saw weapons or violence."[22] Mr. Torrens looked around and was in a selfie photo or two of Mr. Griffith. Along with thousands of others, Mr. Torrens was wrongly located in what was a restricted space demarcated with barriers that had been knocked down or moved.

Earlier that day at the rally, Mr. Torrens and Mr. Griffith ran into Mr. Bledsoe. They had first met Mr. Bledsoe at a rest stop on the drive to Washington, D.C. Outside the Capitol, they saw Mr. Bledsoe again. Many people were going inside the Capitol. It was clear that entry was without permission. There was a door in which someone else had broken a window, and other persons were using it to go inside the building. Mr. Torrens and Mr. Griffith followed a stream of others and went through the broken door. Mr. Torrens knew this was wrong at the time but did it anyway.

Prior to their going inside, a selfie video of the two of them was taken by another and posted on social media by another Mr. Torrens is depicted as saying, "We're going in." Counsel agrees with the FBI agent's conclusion reflected in discovery that Mr. Torrens' voice "sounds excited rather than threatening." Mr. Torrens was connected to Mr. Griffith – the FBI observes: "Torrens was only talking to and obviously with one person." Mr. Torrens recalls, "My friend and I entered through a door that had been forced open. It wasn't a door for the public to use. It was something that the mob took and misused."[23]

The line of people walked in public areas to a rotunda with many statutes of notable (both famous and infamous) Americans (the "Crypt"). Mr. Torrens and Mr. Griffith stayed for just a

---

[22] Mr. Torrens told the FBI that he saw people throwing objects at the police. Earlier, upon his return to Tennessee, he had told his mother that he saw people throwing objects and not the other violence that had been shown on TV, as documented in the FBI report of its interview of his mother.

[23] PSR ¶ 28.

few minutes, exited the Crypt at 2:28 p.m., and retraced their steps the short distance to exit through the same door in which they had entered, in compliance with directions of police officers. Mr. Torrens was in the building for approximately ten minutes. Mr. Torrens returned home to Gallatin, Tennessee that day/night. Upon returning home, he went to work the next day. He did not brag or post about the trip. It was done.

Mr. Torrens did not come to Washington, D.C. to go to the Capitol or to disrupt the certification of the Electoral College. He had no weapons. He committed no violence. He damaged no property. He shouted no incendiary exhortations or threats. He is guilty of the misdemeanor petty offense of parading, demonstrating, or picketing in a Capitol building, in violation of 40 U.S.C. §§ 5104(e)(2)(G) & 5109(b). He exhibited no aggravating conduct during the event.

### III.     Post-Arrest Conduct and Acceptance of Responsibility

Nor did Mr. Torrens exhibit any aggravating conduct after the event. He posted nothing on social media about the trip. He went back to work – chagrined about his extending the trip from the Ellipse to the Capitol and worried that he had made a big mistake. Mr. Bledsoe who was from the same county in Tennessee, had posted the pre-entrance selfie video on social media, and Mr. Griffith talked about the trip back at their Walmart jobsite. News media heightened attention to the video and Mr. Torrens' presence with Mr. Griffith. A concerned citizen reported Mr. Torrens to the FBI shortly after January 6th.

On February 1, 2021, FBI agents visited Mr. Torrens at his job at Walmart. Mr. Torrens voluntarily spoke with the FBI in a recorded interview. He admitted his participation and conduct.[24] He provided his cell phone to the FBI. He was arrested.

---

[24] PSR ¶ 22.

After being presented in the federal district court in Nashville, Mr. Torrens' initial appearance here was February 8, 2021, at which time undersigned counsel was appointed. Pretrial Services has supervised Mr. Torrens since February 1, 2021. Pretrial Services reports his full compliance with all conditions:[25] Mr. Torrens regularly reported to pretrial services, abided by his travel restrictions, committed no crimes, and cut off Mr. Griffith from his life (and will continue to do so after sentencing).[26] Indeed, "Friends/demonstrators/protestors/MAGA-focused people – Eric doesn't hang around them or talk to them."[27]

Additionally, Mr. Torrens appeared timely and non-disruptively at all virtual hearings in this matter. In February 2021, he voluntarily consented to a forensic examination of his cell phone.

The government provided Mr. Torrens with a plea offer on July 14, 2021. The offer expired on September 3, 2021. Mr. Torrens promptly signed the plea paperwork and statement of facts on July 28, 2021,[28] which counsel forwarded that same day to the government so that the government could promptly request that the Court set for a change of plea hearing. Mr. Torrens accepted responsibility and entered his plea of guilty on August 19, 2021. In meeting with the probation officer preparing the Presentence Report, Mr. Torrens expressed clear, definite, and unequivocal acceptance of responsibility and remorse:

---

[25] PSR ¶ 11.

[26] Mr. Torrens no longer worked with Mr. Griffith, which simplified avoiding contact. Mr. Torrens had different conditions of release imposed on him by the federal court in Tennessee. The Tennessee pretrial office also continued those conditions for an additional week or so after February 8th, with Mr. Torrens' compliance.

[27] Eric Torrens, Defendant's Father at 2, *supra* note 15 (Exhibit 4). *See* Jacqueline Torrens, Defendant's Mother (My son has no involvement with any type of radical group or political platform."), *supra* note 15 (Exhibit 5).

[28] In the interim two weeks, undersigned counsel accessed and viewed the discovery on the USAfx database system to fulfill his ethical responsibilities of competence and diligence and negotiated modest corrections to the Statement of Facts until completion of a final version. Mr. Torrens promptly signed the finalized version of the Statement of Facts.

I am very sorry for participating in the actions at the U.S. Capitol on January 6th. I had not even thought about going there when I agreed to join my friend to go to President Trump's rally on the National Mall that day. I supported President Trump, and I thought it would be cool to attend the rally in his support. That was it. When the rally was over, there was this movement toward the Capitol. I didn't put much thought into what I was doing. My friend wanted to go that way; given all the crowds, I didn't want to get separated. I also was excited about being part of this large group.

When we got closer to the Capitol, it was a mess. There were so many people. There were so many more people than there were police officers. People were throwing things at the police. I should have just gotten out of there. Instead, I kept going. That was a decision that I made. It was also a mistake. I got caught up with the mob, and by being there, I became part of the mob. I regret that, and I really feel bad about it.

Many people had gone into the building before me. It was like a line. My buddy and I followed behind. We didn't have permission to enter the building, and I knew then that we didn't have permission. I knew that we were trespassing, or more, but I did it anyway - along with my friend and everyone else. My friend and I didn't go through a door, or security, or another like tourists. Because the people who were there that day weren't tourists, it was a mob, including lots of angry people and as I said before, including people who threw things at and assaulted the police.

My friend and I entered through a door that had been forced open. It wasn't a door for the public to use. It was something that the mob took and misused. I don't recall saying, "We're going in." But I sure did say it, because I heard and saw myself on the cell phone video. Once inside, we didn't do much, followed the line of people, there for like 5 or so minutes and turned back around and left the same way we came in.

**How do I feel about it now?** I feel real bad. I made a huge mistake that day. When the FBI came to my at my old job, I told them what I did. When I was arrested, I knew that I would plead guilty - because I am guilty. My former co-workers (I basically lost my job when my picture was on the news), my neighbors, and my family look at my differently. I'm going to have to tell my daughter about it someday, and how I ended up being convicted of a crime. It won't be a experience and result that I'll be proud to share. **I'm ashamed and embarrassed about what I did.** It was wrong. And I'll never do something that again.[29]

---

[29] PSR ¶ 28 (emphasis added). Mr. Torrens' father speaks of his own transferred shame: "[Eric] knows his parents are heartbroken and Ashamed." Eric Torrens, Defendant's Father, at 2, *supra*

Mr. Torrens has since reflected even more on that day and what he did. He wrote a lengthy letter to the Court to be submitted along with this memorandum.[30] Undersigned counsel understands the Court will read the letter for itself and directs the Court to **Exhibit 1**. Counsel highlights Mr. Torrens's thoughts about his lack of reflection at the time and current concerns as to how the police officers and other persons defending, and inside, the Capitol must have felt:

> I love this county and I shouldn't have done what I did. I'm very sorry for these stupid decisions and actions that I made. With this madness going on, I <u>saw</u> the police being overwhelmed. But I didn't <u>think</u> about the police being overwhelmed. I didn't <u>think</u> about what could have happened to any of them. If I had thought, I would have gotten out of there. Staying there, being part of it, that's not the person who I think I am. Or want to be. I really am ashamed of myself about it every day.
> . . .
>
> I feel bad about the police now when I reflect back on that day. I think about how some of them were probably scared and thinking of their families and wondering if they were going to make it home or not. I think about how their families were probably watching it on TV, scared for the officers, and wondering if the people they loved who were police officers were going to make it home. I wish that no one had to feel that way that day.
> . . .
>
> I'm truly very sorry that you and everyone else involved with the court had to even deal with these cases because no true American should ever had participated in these actions and caused the need for court. We were wrong that day. I apologize to the congress members and the people inside the building as well. They must have felt threatened and been afraid of what what [sic] was happening and all the people in the mob.[31]

Human beings commit misjudgments, mistakes, and even crimes. Our humanity is found in our ability to learn and grow from our mistakes. To err is human.[32] The question is: How do

---

at note 15 (Exhibit 4). I can't count how many conversations we have had regarding the hurt he has cause to many." *Id.*

[30] Letter, Eric Chase Torrens, Defendant (Oct. 14, 2021) (Exhibit 1).

[31] *Id.* (emphases in original).

[32] Alexander Pope, An Essay on Criticism, Part II (1711).

we respond to our errors? Counsel sees that Mr. Torrens has responded with apology, contrition, and resolve to be a better person out of it. Those closest to him see it as well. His uncle, a retired U.S. Navy underwater construction driver, observes, "I believe when there is a good and strong foundation you can rebuild it if you acknowledge your mistakes and correct them. I have spoken to Eric on numerous occasions, and he has apologized and is extremely ashamed and remorseful by the dishonor he has brought to his family and country."[33]

Back home, Mr. Torrens avoids the wrong people[34] and tries to grow and contribute to his community. His life is primarily spent at his job and taking care of his daughters.[35] Counsel has viewed Mr. Torrens' monthly financial records, which bear out his nose-to-grindstone, daughter-first approach to life. Having inflicted damage on his country, he has sought to contribute some repair: Mr. Torrens volunteers at an animal rescue organization on the weekends. Because Mr. Torrens became infected with COVID-19 and got very sick, his community service delayed starting. As of this writing, Mr. Torrens has participated in multiple volunteer days, and he plans to continue to volunteer for as long as he can.[36] Counsel recommends that community service is a condition of probation.

---

[33] Letter from Jorge L. Torrens' Defendant's Uncle (undated) (Exhibit 6).

[34] *Id.* ("A rally to support and protest turned into a mob of misguided fools. Eric was not part of any organized group and is no longer in contact with any persons connected or involved with the demonstrations that led to the illegal entry into the U.S. Capitol.").

[35] "Eric now works full time but does not make much money. His life now has just been working, coming home and spending time with his daughter teaching and taking care of her. He doesn't even have a girl but a couple friends because he says it all about the daughter now." Eric Torrens, Defendant's Father, *supra* note 15 (Exhibit 4).

[36] Rather than piecemeal productions of documentation, counsel will provide the Court with documentation of his community service by supplement in advance of the sentencing hearing.

## IV.    Application of the Government's Nine Factors Supports Probation

In other January 6 cases – including that of co-defendant Griffith – the government

advocates:

> While looking at the defendant's individual conduct, we must assess such
> conduct on a spectrum and with an eye towards its larger consequences. This
> Court, in determining a fair and just sentence on this spectrum, should look to a
> number of critical factors, to include: (1) whether, when, how the defendant
> entered the Capitol building; (2) whether the defendant engaged in any violence
> or incited violence; (3) whether the defendant engaged in any acts of destruction;
> (4) the defendant's reaction to acts of violence or destruction; (5) whether during
> or after the riot, the defendant destroyed evidence; (6) the length of the
> defendant's time inside of the building, and exactly where the defendant traveled;
> (7) the defendant's statements in person or on social media; (8) whether the
> defendant cooperated with, or ignored, law enforcement; and (9) whether the
> defendant otherwise exhibited evidence of remorse or contrition. While these
> factors are not exhaustive nor dispositive, they help to place each individual
> defendant on a spectrum as to their fair and just punishment.[37]

Here, as to being at the U.S. Capitol, Mr. Torrens came to Washington, D.C. to

participate lawfully and peacefully at a rally hosted and organized by the President of the United

States. Mr. Torrens traveled with one friend, not belonging or connected to any formal or

informal militant organizations. He followed others through a door that had been broken prior to

his arrival and entry. He engaged in no violence. He incited no violence. He engaged in no acts

of destruction. He saw people throwing things at officers but did not see any weapons or direct

confrontations. He did not encourage or participate in violence and has the mob's actions by

calling them unlawful and wrong. He destroyed or took no evidence during or after the event.

Mr. Torrens was inside the building for only ten minutes, traveling from the door to the Crypt

and back out again. He was in public spaces at all times. He did not go anywhere near, or enter,

---

[37]ECF 92, Government's Sentencing Memorandum for Mr. Griffith, at 16.

any offices or chambers housing members of Congress or their staffs. He stole nothing. His only statement on scene was to express excitement about going inside.

Upon leaving the Capitol, Mr. Torrens made no incendiary or other statements afterward – whether on social media or to persons face-to-face. He factually reported to his mother where he had gone and what he had seen. Mr. Torrens fully cooperated with the FBI. He answered their questions. He gave them his phone. He provided the password to his phone. He consented to a forensic examination. He agreed to meet with law enforcement, if requested, after his plea (and remains willing to do so). Mr. Torrens has exhibited remorse and contrition – as clearly seen in his acceptance-of-responsibility statement to the presentence report writer and in his attached letter to this Court. He pleaded guilty as quickly as he could – signing the final papers two weeks after a draft was received and counsel recalls hours (perhaps it was days) after receipt of the final statement of facts. He literally could not have accepted responsibility any sooner than he did.

The Court, not the government nor defense counsel, decides what factors matter to it, but to the extent the government's factors "help place each individual defendant on a spectrum as to their fair and just punishment,"[38] the government's factor strongly demonstrate that Mr. Torrens fits on the lowest end of that spectrum and that a sentence of a term of probation is appropriate.

As of October 29, 2021, Mr. Torrens will be a federal convict, a designation that his own actions earned him and one for which he is deeply ashamed. As someone charged and convicted with a criminal offense, he has incurred a raft of collateral and informal consequences. He lost his job at the time – especially jarring because his mother worked at the same store. And Mr. Torrens has received repeated public shaming each time his local news media amplifies his case in the community. Large photos of his face are presented on the internet or displayed within

---

[38] *Id.*

videos embedded on news media websites, capping stories that detail his criminal conduct and association with the larger set of purposeful insurgents and vandals.[39] Perhaps seen as deservedly so, but for the rest of his life he bears the social stigma of a rioter in one of the most infamous events in U.S. history.

After his sentencing, Mr. Torrens will experience incrementally the other incidents of punishment. Misdemeanor convictions are "fodder for decisionmakers as diverse as landlords, employers, and social workers. The collateral consequences of even a minor arrest can thus have ripple effects throughout a person's personal and economic life."[40] In Tennessee, for example, some employment consequences can include ineligibility for employment as a correctional officer, for public employment, for a CDL license, a home inspector's license, for a child care license, to become a security guard, and (perhaps the reader can see he might aspire for given his interest in animals) for a veterinary technician's license.[41] A conviction can place limitations on post-secondary education.[42] Faced with applications from record-free applicants and Mr. Torrens, employers may choose to hire someone without a conviction instead of Mr. Torrens. Mr. Torrens is still a young man. As he moves through life and explores work with greater

---

[39] *See, e.g.*, In video, Gallatin man cheers as he enters broken door of capitol during riots | News | wsmv.com (Sept. 19, 2021); The Government Wants To Keep Capitol Riot Footage Secret (buzzfeednews.com) (Aug. 30, 2021); Eric Chase Torrens pleaded guilty to his role in the U.S. Capital riot (tennessean.com) (Aug. 19, 2021); US Capitol Arrests: Eric Torrens INDICTED - YouTube (July 9, 2021); Local news, tip leads FBI to Eric Torrens, arrested in Capitol riot (tennessean.com)(Feb. 2, 2021); Gallatin man arrested in connection to U.S. Capitol riot released from custody (tennessean.com) (Feb. 1, 2021); Gallatin man arrested on charges relating to Capitol riots (newschannel5.com) (Feb. 1, 2021).

[40] Alexandra Natapoff, *Appreciating the Full Consequences of a Misdemeanor*, Collateral Consequences Resource Center (May 10, 2018), *available at* Appreciating the full consequences of a misdemeanor (ccresourcecenter.org).

[41]  Collateral Consequences Inventory | National Inventory of Collateral Consequences of Criminal Conviction (nationalreentryresourcecenter.org).

[42] *Id.*

17

economic potential, his criminal conduct and its resulting misdemeanor conviction will create

hurdles he has not even yet even yet contemplated. Counsel writes the foregoing not to

exaggerate the societal punitive effects of the conviction but simply to make the simple point that

a federal conviction and probation are serious, consequential matters. Mr. Torrens made his life

harder and future difficult when he went inside the Capitol, and his life will become even harder

and his future even more difficult after he is sentenced for what he did.

## CONCLUSION

For these reasons and any that shall be advanced at the sentencing hearing, counsel for

Mr. Torrens respectfully requests that this Court place Mr. Torrens on supervised probation, with

such conditions as are just and appropriate.

Respectfully Submitted,

/s/ EDWARD J. UNGVARSKY
Edward J. Ungvarsky
Ungvarsky Law, PLLC
114 North Alfred Street
Alexandria, VA 22314
Office - 571 207 9710
Cellular – 202 409 2084
ed@ungvarskylaw.com
Counsel for Eric Chase Torrens

## CERTIFICATE OF SERVICE

I hereby certify that a copy of this Memorandum was served ECF to the government and
all registered recipients on this 15th day of October, 2021.

/s/ EDWARD J. UNGVARSKY
Edward Ungvarsky