**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 1:21-cr-00204-002 (BAH)** |
| **v.** | : | |
| | : | |
| **ERIC CHASE TORRENS,** | : | |
| | : | |
| | : | |
| **Defendant.** | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the Acting United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Eric Torrens to two weeks of incarceration and $500 in restitution.

## I.     Introduction

The defendant, Eric Chase Torrens, and his three co-defendants participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred law enforcement officers, and resulted in more than a million dollars' worth of property damage.

Torrens pled guilty to one count of 40 U.S.C. § 5104(e)(2)(G): Parading, Demonstrating, or Picketing in the Capitol Building. As explained below, a short custodial sentence is appropriate in this case because of the seriousness of Torrens' crime on January 6th. Torrens admitted to agents that it seemed like people in the crowd were "antagonizing" or "trying to like, get a riot going." He also saw rioters throwing things at law enforcement and spraying them with pepper spray. The

1

video evidence shows part of the chaos that he witnessed as he pushed forward onto the restricted grounds and into the Capitol itself.

Following his crime, Torrens has proactively taken steps to accept responsibility for his crime and has followed his pretrial release conditions. He debriefed with law enforcement voluntarily, he pled guilty early in the case, and he has already demonstrated what seems to be a heartfelt reflection and acknowledgment of his crime.

Nevertheless, the defendant's conduct on January 6th, like the conduct of other defendants, took place in the context of a large and violent riot in which sheer numbers combined with violence to overwhelm law enforcement, allowing rioters to breach the Capitol and disrupt the proceedings. The riot would not have happened but for his actions and the actions of so many others. Here, the defendant's participation in a riot that succeeded in delaying the Congressional certification renders a short custodial sentence both necessary and appropriate.

## II.   Factual and Procedural Background

### The January 6, 2021 Attack on the Capitol

To avoid exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 63 (Statement of Offense), at ¶¶ 1-9. As this Court knows, a riot cannot occur without rioters, and each rioter's actions—from the most mundane to the most violent—contributed, directly and indirectly, to the violence and destruction of that day. The sheer number of people who chose to be a part of this attack on democracy overwhelmed the Capitol despite attempts by law enforcement to fight them off. Even those who did not attack others, destroy property, or threaten members of congress themselves supported those who did by joining them. The presence and participation of each and every one of these people encouraged and enabled other rioters as they breached the grounds and the building.





With that backdrop we turn to the defendant's conduct and behavior on January 6th.

*Torrens's Role in the January 6, 2021 Attack on the Capitol*

Eric Chase Torens and his co-defendant and co-worker Jack Griffith drove from Tennessee to Washington, D.C. to attend the "Stop the Steal" rally. *See* ECF No. 74, ¶ 10. The "Stop the Steal" rally took place at the Ellipse. Torrens and Griffith entered the restricted Capitol grounds. *Id.* Griffith and Torrens spent time in the crowd nearby the inauguration stage on the west side of the U.S. Capitol building. *Id.*



There, Torrens could see members of the crowd repeatedly attacking law enforcement officers who were trying to protect the Capitol. Torrens did not stop; he did not leave.

Instead, Torrens and Griffith capitalized on the attacks that cleared their path, and made their way to the stairs underneath the northwest scaffolding. Torrens continued up the northern set of stairs underneath the scaffolding to the northwest terrace, near the Senate wing of the building— a significant breach point on January 6th. *Id.*; ECF No. 67, Ex. 1.[1] Video evidence shows another angle of Torrens under the scaffolding. ECF No. 67, Ex. 2. Around 8 minutes and 55 seconds into the video, Torrens and Griffith nonchalantly watch the crowd. The nearby narrator of the video

---

[1] The government previously provided the Court with video exhibits as reported in its filing ECF No. 63.  Those videos have been reviewed by the Court in association with Torrens' guilty plea; they have also been made available to the public as ordered by the Court (ECF No. 83).

says "I don't know what is going on with the Capitol police; honestly, it's a mad house; it's a fucking…it's a mad house." *Id.* The video shows the line of officers holding back the rioters at the west front with tear gas audibly exploding and billowing out. The video, ECF 67, Ex. 3 (21:17 – 21:31), captures Torrens and Griffith on the northwest terrace, looking out at the crowd with smiles. Outside of the Capitol Torrens and Griffith posed for pictures:



Other rioters had broken open a door and two nearby windows on the Senate side of the building. ECF 74, ¶ 11. Torrens's entrance is captured on the selfie-style video that his co-defendant Matthew Bledsoe shared on social media. ECF 74, ¶ 11; ECF 67, Ex. 5. An alarm can be heard blaring in the background. Torrens says, "We're going in!" and co-defendant Griffith screams in excitement. ECF 74, ¶ 11; ECF 67, Ex. 5 (screenshot from video below).



Torrens and his co-defendants entered through that door as others climb in through broken windows nearby. *Id.*



Once inside, Torrens and his co-defendants made their way to the Crypt. ECF 74, ¶ 12. Torrens spent time in various parts of the Crypt, which can be seen in surveillance footage. *Id.* After approximately ten minutes inside the Capitol, Torrens eventually moved back toward the same door he entered and ultimately exited the building.

*Torrens' Post-Arrest Conduct*

On February 1, 2021, Torrens was arrested on the pending charges and voluntarily spoke to FBI agents and admitted entering the Capitol building on January 6th. ECF 74, ¶ 13.  The discussion is audio recorded.  He was forthcoming with the agents, admitted his conduct, gave the agents details about how he got there and who he traveled with, and described what he saw and did that day.

Torrens told the agents that he listened to the speeches at the rally, then walked to the Capitol. He got to the Capitol with the crowd and was not sure if he was supposed to be there. He

saw people in the crowd throwing things at the police and spraying the police with something that seemed to be pepper spray or tear gas.  He thought these attacks were, "fucked up," and it seemed like people in the crowd were "antagonizing" or "trying to like, get a riot going." Torrens told the agents that he went into the Capitol building and stayed a short time. His common sense kicked in, and he left. Looking back, he felt that it was "a trap for Trump supporters" because people were telling others to go inside and telling the police to stand down. He said the police officers were nice and trying to help people get out of the building.

Since Torrens's arrest, it appears that he has been compliant with his release conditions. ECF No. 70.

<em>The Charges and Plea Agreement</em>

On January 27, 2021, Torrens was charged by complaint with violating 18 U.S.C. §§ 1752(a)(1), (a)(2), and 40 U.S.C. §§ 5104(e)(2)(D) and (G). *United States v. Torrens*, Case No. 21-mj-171, ECF No. 1. On February 1, 2021, he was arrested in Tennessee and was released on pretrial bond. On March 10, 2021, Torrens and his co-defendants were indicted by a grand jury. ECF No. 23. Torrens was charged with the same four offenses. On August 19, 2021, he pled guilty to a violation of 40 U.S.C. § 5104(e)(2)(G), Parading, Demonstrating, or Picketing in a Capitol Building. ECF Nos. 73, 74. By plea agreement, Torrens agreed to pay $500.00 in restitution. In addition to taking responsibility for his crime by way of guilty plea, he also included a personal statement in his pretrial services report.  ECF No. 87, ¶ 28.[2]

---

[2] As of the date of this filing, the final PSR has not been filed on ECF; therefore the government is citing to the draft PSR.

### III.    Statutory Penalties

The defendant is now scheduled to be sentenced on a single count of 40 U.S.C. § 5104(e)(2)(G). As noted by the plea agreement and the U.S. Probation Office, the defendant faces up to six months of imprisonment and a fine of up to $5,000.00. As discussed below, the defendant must also pay restitution under the terms of his plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

### IV.    Sentencing Factors Under 18 U.S.C. § 3553(a)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). Some of the factors this Court must consider include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. § 3553(a)(6). In this case, all of the Section 3553(a) factors weigh in favor of incarceration.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol, on January 6, 2021 is a criminal offense unparalleled in American history. It represented a grave threat to our democratic norms; indeed, it was the one of the only times in our history when the building was literally occupied by hostile participants. By its very nature, the attack defies comparison to other events.

While each defendant should be sentenced based on their individual conduct as we now discuss, this Court should note that each individual person who entered the Capitol on January 6th did so under the most extreme set of circumstances and played a role in the larger riot by

encouraging others with their presence and straining law enforcement resources. *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 25 ("A mob isn't a mob without the numbers. The people who were committing those violent acts did so because they had the safety of numbers.") (statement of Judge Chutkan). As a person who entered the Capitol, they would— at a minimum—have crossed through numerous barriers and barricades and heard the din of the mob. Depending on the timing and location of their approach, they also may have observed extensive fighting with law enforcement and likely would have smelled chemical irritants in the air.

Make no mistake, no rioter was a mere tourist that day. These rioters did not go through a security screening. They did not receive an admission ticket or attend an introductory video about the history of our nation in the Capitol Visitors Center. They were not given instructions by a docent or staff member on what to do as a tourist in the Capitol. They did not move quietly through public areas of the Capitol listening to their docent or staff member sharing insights about the building's history and its importance to the American people.

While looking at the defendant's individual conduct, we must assess such conduct on a spectrum and with an eye towards its larger consequences. This Court, in determining a fair and just sentence on this spectrum, should look to a number of critical factors, to include: (1) whether, when, how the defendant entered the Capitol building; (2) whether the defendant engaged in any violence or incited violence; (3) whether the defendant engaged in any acts of destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored, law enforcement; and (9) whether the

defendant otherwise exhibited evidence of remorse or contrition. While these factors are not exhaustive nor dispositive, they help to place each individual defendant on a spectrum as to their fair and just punishment.

The nature and circumstances of this offense are serious. Torrens traveled from Tennessee to D.C.—a lengthy and costly trip—to attend the "Stop the Steal" rally. Once there, he joined the crowds of people who overwhelmed law enforcement and helped make the violent attacks and destruction caused by other rioters possible. He walked to the restricted grounds of the Capitol where he was in a position to observe chaos as people attacked law enforcement and climbed scaffolding. He, himself, described the chaos to the FBI agents who arrested him—noting the crowd throwing things at law enforcement, spraying law enforcement, and trying to incite a riot.

In the pictures and videos, he is seemingly unbothered and detached from the chaos around him, going along with his co-defendants. As he approached the entrance into the Capitol building, he yelled, "We're going in!," while his co-defendant Matthew Bledsoe took photos and videos which he would later use to promote the crimes on social media. He entered through a door that had been broken open with an alarm audibly blaring in the background and other rioter climbing through broken windows on either side. Any person with common sense would know at that point that their actions were wrong and unlawful.

Any reasonable person would have long-since gathered that the barriers were set up to show where the restricted grounds began, that the tear gas was not a welcome signal, and that the large group of people attacking officers was not an organized tour. He then walked further into the building entering the Crypt.  While there, he took a picture of his co-defendant Jack Griffith who was smiling, with his fist in the air.  Torrens eventually left—not because he thought his behavior

was wrong or felt remorse in that moment, but because he thought it was a trap for Trump supporters. There is no question that the nature and circumstances of the offense are serious.

### B.  The History and Characteristics of the Defendant

The PSR sheds light on Torrens's history and characteristics. As set forth in the PSR, Torrens has no criminal history and has a history of employment. ECF No. 87, ¶¶ 31-38, 53-59. Torrens appears to have been compliant with his conditions of pre-trial release.

The way in which Torrens has conducted himself in these criminal proceedings contrasts starkly with his co-defendant Jack Griffith's behavior.  Torrens has taken responsibility for his actions and shown remorse at multiple opportunities.  The government has no evidence of social media posts by Torrens promoting his crimes. As soon as he was arrested by the FBI, he voluntarily waived his rights and told the agents about his involvement.  Torrens accepted the government's plea offer early on in this case demonstrating his acceptance of responsibility. Torrens included a detailed statement in the PSR expressing his remorse and took responsibility for his actions without any attempt to blame others or give excuses.  ECF No. 87, ¶ 28.   It appears he has reflected on his actions and considered the ramifications of his crime.

Considering his lack of criminal history, his employment history, and his post-arrest conduct, the government requests a short custodial sentence.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds, and all that it involved, was an attack on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6th showed a blatant and appalling disregard for our institutions of government and the orderly

administration of the democratic process."[3] As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most January 6th riot cases including in misdemeanor cases. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan). A sentence of probation or home confinement would be insufficient here.

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The demands of general deterrence weigh in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. The violence at the Capitol on January 6th was cultivated to interfere, and did interfere, with one of the most important democratic processes we have: the transfer of power. As noted by Judge Moss during sentencing, in *United States v. Paul Hodgkins*, 21-cr-188-RDM:

---

[3] Statement of Christopher Wray, Director, Federal Bureau of Investigation, Statement Before the Committee on Oversight and Reform U.S. House of Representatives At a Hearing Entitled "Examining the January 6 Attack on the U.S. Capitol" Presented June 15, 2021 (hereinafter "FBI Director Wray's Statement"), available at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20 Testimony.pdf (last accessed October 7, 2021).

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to
> attack the Capitol to prevent our elected officials from both parties from performing
> their constitutional and statutory duty, democracy is in trouble. The damage that
> [the defendant] and others caused that day goes way beyond the several-hour delay
> in the certification. It is a damage that will persist in this country for decades.

Tr. at 69-70.

Indeed, the attack on the Capitol means "that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy. It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation." *Id.* at 70; *see also United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 24 ("What happened on that day was nothing less than the attempt of a violent mob to prevent the orderly and peaceful certification of an election as part of the transition of power from one administration to the next, something that has happened with regularity over the history of this country. That mob was trying to overthrow the government.") (statement of Judge Chutkan).

The gravity of these offenses demands deterrence. This was not a protest. *See Hodgkins,* 21-cr-188-RDM Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss). And it is important to convey to future rioters and would-be mob participants— especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

The government acknowledges that the Defendant accepted responsibility early by entering into this plea agreement. On the other hand, Torrens's conduct on January 6, 2021 demonstrates the need for specific deterrence for this defendant.

13

### E. The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, to assault on law enforcement officers, to conspiracy to corruptly interfere with Congress. Each offender must be sentenced based on their individual circumstances, but with the backdrop of January 6th in mind. Moreover, each offender's case will exist on a spectrum that ranges from conduct meriting a probationary sentence to crimes necessitating years of imprisonment.

The misdemeanor defendants will generally fall on the lesser end of that spectrum, but that in no way means that misdemeanor breaches of the Capitol on January 6, 2021 were minor crimes. A probationary sentence should not become the default.[4] Indeed, the government invites the Court to join Judge Lamberth's admonition that "I don't want to create the impression that probation is the automatic outcome here because it's not going to be." *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164 (RCL), Tr. 6/23/2021 at 19; *see also United States v. Valerie Ehrke*, 1:21-cr-00097 (PFF), Tr. 9/17/2021 at 13 ("Judge Lamberth said something to the effect . . . 'I don't want to create the impression that probation is the automatic outcome here, because it's not going to be.' And I agree with that. Judge Hogan said something similar.") (statement of Judge Friedman).

While the number of sentenced defendants is low, we have already begun to see meaningful distinctions between offenders. Those who engaged in felonious conduct are generally more

---

[4]  Early in this investigation, the Government made a very limited number of plea offers in misdemeanor cases that included an agreement to recommend probation, including in *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164(RCL); *United States v. Valerie Elaine Ehrke*, 1:21-cr-00097(PFF); and *United States v. Donna Sue Bissey*, 1:21-cr-00165(TSC). The government is abiding by its prior agreement to recommend probation in these cases. *Cf. United States v. Rosales-Gonzales*, 801 F.3d 1177, 1183 (9th Cir. 2015) (no unwarranted sentencing disparities under 18 U.S.C. § 3553(a)(6) between defendants who plead guilty under a "fast-track" program and those who do not given the "benefits gained by the government when defendants plead guilty early in criminal proceedings") (citation omitted).

dangerous, and thus, treated more severely in terms of their conduct and subsequent punishment. Those who trespassed, but engaged in aggravating factors, merit serious consideration of institutional incarceration. While those who trespassed, but engaged in less serious aggravating factors, deserve a sentence more in line with minor incarceration or home confinement.

A review of the applicable Section 3553(a) factors demonstrates that a two-week custodial sentence is appropriate. Unlike his co-defendant Jack Griffith, post-arrest conduct shows that he has taken responsibility and appears to have reflected on his actions.  That difference accounts for the different government sentencing recommendations in the two cases.

### F.        Restitution

As noted above, the defendant agreed under the terms of the plea agreement to pay $500 in restitution. The Court ordered the government to address restitution in anticipation of the defendant's sentencing. We submit this explanation to aid the Court.

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case. Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). Two general restitution statutes provide such authority. First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *Papagno*, 639 F.3d at 1096. Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA. *Papagno*, 639 F.3d at 1096. The applicable procedures for restitution orders issued and

enforced under these two statutes is found in 18 U.S.C. § 3664. *See* 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).[5]

The VWPA and MVRA share certain features. Both require that restitution "be tied to the loss caused by the offense of conviction." *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA); *see United States v. Clark*, 747 F.3d 890, 897 (D.C. Cir. 2014) (restitution under the MVRA limited to the "offense of conviction" under *Hughey*). Both require identification of a victim, defined in both statutes as "a person directly and proximately harmed as a result of" the offense of conviction.[6] *See* 18 U.S.C. § 3663(a)(2); 18 U.S.C. § 3663A(a)(2). Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury. *See Papagno*, 639 F.3d at 1096-97; § 3663(b); § 3663A(b). Finally, under both the statutes, the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim. *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019). The relevant inquiry is the scope of the defendant's conduct and the harm suffered by the victim as a result. *See Emor*, 850 F. Supp. 2d at 202. The use of a "reasonable estimate" or reasonable approximation is sufficient, "especially in cases in which an exact dollar amount is inherently incalculable."[7] *United States v. Gushlak*, 728 F.3d 184, 196 (2d Cir. 2013); *see United*

---

[5] Several other criminal statutes authorize restitution for specific offenses. *See, e.g.*, 18 U.S.C. § 43(c) (damaging or interfering with an enterprise involving animals); 18 U.S.C. § 228(d) (child support violations; 18 U.S.C. § 1593 (peonage, slavery, and trafficking in persons); 18 U.S.C. § 2248 (sex crimes); 18 U.S.C. § 2259 (sexual exploitation of children); 18 U.S.C. § 2264 (domestic violence); 18 U.S.C. § 2327 (telemarketing fraud); 18 U.S.C. § 853(q) (amphetamine and methamphetamine offenses). None of those statutes are at issue in Torrens's case.

[6] The government or a governmental entity can be a "victim" for purposes of the VWPA and MVRA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

[7] The sentencing court should "articulate the specific factual findings underlying its restitution order in order to enable appellate review." *Fair*, 699 F.3d at 513.

*States v. Sheffield*, 939 F.3d 1274, 1277 (11th Cir. 2019) (estimating the restitution figure is permissible because "it is sometimes impossible to determine an exact restitution amount") (citation omitted); *United States v. James*, 564 F.3d 1237, 1246 (10th Cir. 2009) (restitution order must identify a specific dollar amount but determining that amount is "by nature an inexact science" such that "absolute precision is not required") (citation omitted); *United States v. Burdi*, 414 F.3d 216, 221 (1st Cir. 2005) (same); *see also Paroline v. United States*, 572 U.S. 434, 459 (2014) (observing in the context of the restitution provision in 18 U.S.C. § 2259 that the court's job to "assess as best it can from available evidence the significance of the individual defendant's conduct in light of the broader casual process that produced the victim's losses . . . cannot be a precise mathematical inquiry").

The statutes also differ in significant respects. As noted above, the VWPA is a discretionary restitution statute that permits, but does not require, the sentencing court to impose restitution in any case where a defendant is convicted under Title 18 or certain other offenses in Title 21 or Title 49. 18 U.S.C. § 3663(a). In deciding whether to impose restitution under the VWPA, the sentencing court must take account of the victim's losses, the defendant's financial resources, and "such other factors as the court deems appropriate." *United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C. 2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)). By contrast, as noted above, the MVRA applies only to certain offenses, such as a "crime of violence," § 3663A(c)(1)(A), or "Title 18 property offenses 'in which an identifiable victim . . . has suffered a physical injury or pecuniary loss,'" *Fair*, 699 F.3d at 512 (citation omitted), but it requires imposition of full restitution without respect to a defendant's ability to pay.[8]

---

[8] Both statutes permit the sentencing court to decline to impose restitution where doing so will "complicat[e]" or "prolong[]" the sentencing process.  *See* 18 U.S.C. § 3663(a)(1)(B)(ii); 18 U.S.C. § 3663A(c)(3)(B).

While both statutes generally limit restitution to losses resulting from conduct that is the basis of the offense of conviction, they also authorize the court to impose restitution under the terms of a plea agreement. *See* 18 U.S.C. § 3663(a)(3); 18 U.S.C. § 3663A(a)(3); *see United States v. Zerba*, 983 F.3d 983, 986 (8th Cir. 2020); *United States v. Giudice*, 2020 WL 220089, *5 (D.N.J. Jan. 15, 2020). As relevant to Torrens's case, the sentencing court under the VWPA "may also order restitution in any criminal case to the extent agreed to by the parties in a plea agreement." 18 U.S.C. § 3663(a)(3). Under Section 3663(a)(3), a defendant may agree to pay restitution even where the offense of conviction falls outside of the statutes otherwise covered by the VWPA. *See United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008) (upholding restitution agreement under Section 3663(a)(3) where defendant was convicted under 26 U.S.C. § 7201). A defendant's agreement to pay restitution under Section 3663(a)(3) is a binding promise, *United States v. Pappas*, 409 F.3d 828, 830 (7th Cir. 2005), and the sentencing court is not required to independently evaluate the defendant's ability to pay when restitution is made part of the plea agreement under that provision, *United States v. Allen*, 201 F.3d 163, 167-68 (2d Cir. 2000).

Application of these restitution principles to Torrens's case is straightforward. The defendant entered a guilty plea to one count of Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G). That offense of conviction does not trigger the MVRA because it does not fall within the "subset" of crimes covered under that statute. *See* 18 U.S.C. § 3663A(c)(1)(A); *Papagno*, 639 F.3d at 1096. Torrens's non-Title 18 offense of conviction also does not fall within the statutes covered by the VWPA. *See* 18 U.S.C. § 3663(a)(1)(A). Restitution here nonetheless properly falls within the scope of Section 3663(a)(3) because the plea agreement requires Torrens to pay $500 in restitution. *See Anderson*, 545 F.3d at

1078-79. The Court thus is authorized to impose restitution "to the extent agreed to by the parties" in the plea agreement. 18 U.S.C. § 3663(a)(3).

The VWPA also provides that restitution ordered under Section 3663 "shall be issued and enforced in accordance with section 3664." 18 U.S.C. § 3663(d). Because this case essentially involves the related criminal conduct of hundreds of defendants, the Court has discretion to: (1) hold the defendants jointly and severally liable for the full amount of restitution owed to the victim(s), *see* 18 U.S.C. § 3664(f)(1)(A) (requiring that, for restitution imposed under § 3663, "the court shall order restitution to each victim in the full amount of each victim's losses as determined by the court and without consideration of the economic circumstances of the defendant"); or (2) apportion restitution and hold the defendant and other defendants responsible only for each defendant's individual contribution to the victim's total losses. 18 U.S.C. § 3664(h).

The government and Torrens, pursuant to the plea agreement, have requested the Court to apportion liability for restitution for damages arising from the riot at the United States Capitol. For this case, the parties have agreed that the Court may impose restitution in the amount of $500. This amount fairly reflects the Torrens's role in the offense and the damages resulting from his conduct. This amount properly reflects the defendant's role, but also considers the various legal and factual issues associated with calculating the actual losses for property damage to the United States Capitol and incurred by law enforcement agencies, additional costs incurred for security personnel, and bodily injuries sustained by law enforcement personnel. In consideration of these factors, the restitution amount reflected in the plea agreement fairly represents an apportionment of Torrens's liability and, therefore, is proper in this case.

Though not implicated in Torrens's case, the Court asked the government to explain how it reached the restitution amount reflected in the plea agreement, which notes that, as of May 17,

2021, the riot at the United States Capitol had caused "approximately $1,495,326.55" in damages. *See* Plea Agreement, ECF No. 62, ¶ 11. As noted above, determining the restitution amount is an "inexact science," *James*, 564 F.3d at 1246, that must be based on a "reasonable approximation of losses supported by a sound methodology," *Gushlack*, 728 F.3d at 196. The nearly $1.5 million figure quoted in the defendant's plea agreement represented loss estimates provided by Architect of the Capitol as of mid-May 2021. The government continues to investigate losses that resulted from the breach of the Capitol on January 6, 2021, a process that involves several facets. As a factual matter, the government is continuing to collect evidence concerning, *inter alia*, (1) the cost of damage to the Capitol Building and Grounds, both inside (*e.g.*, doors, windows, offices, office equipment, hallways, the Rotunda, the Crypt, etc.) and outside (*e.g.*, doors, windows, barricades, scaffolding, etc.); (2) the costs associated with the deployment of additional law enforcement units to the Capitol on January 6th; (3) the cost of broken or damaged law-enforcement equipment; (4) the cost of stolen property; and (5) costs associated with bodily injuries sustained by law-enforcement officers and other victims. As a legal matter, *some* of these costs (such as property damage and medical injuries) clearly fall within the scope of the restitution statutes as applied to *some* defendants (*e.g.*, defendants who broke a window or committed aggravated assault against an law enforcement officer). But other costs, including employees' work time, *see United States v. Wilfong*, 551 F.3d 1182, 1184 (10th Cir. 2008), and the proper method for assessing value of damaged or destroyed property, *see United States v. Shugart*, 176 F.3d 1373, 1375 (11th Cir. 1999), raise more challenging questions that should be resolved as they arise. To the extent a victim's losses in a particular case are "not ascertainable" at the time of sentencing, Section 3664 permits an extension of up to 90 days for a "final determination" of those losses. 18 U.S.C. § 3664(d)(5); *see Dolan v. United States*, 560 U.S. 605, 611 (2010) (allowing a sentencing court

to order restitution after the 90-day deadline under some circumstances). None of these questions, however, arise in Torrens's case.

## V.      Conclusion

Sentencing here requires that the Court carefully balance the various factors set forth in 18 U.S.C. § 3553(a). As detailed above, those factors on balance support a sentence of incarceration. The government recommends that this Court sentence Eric Chase Torrens to two weeks of incarceration and $500 in restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on his liberty as a consequence of his behavior, while recognizing his early acceptance of responsibility.

Respectfully submitted,

CHANNING D. PHILLIPS
ACTING UNITED STATES ATTORNEY


By:     /s/ *Mitra Jafary-Hariri*
MITRA JAFARY-HARIRI
Assistant United States Attorney
Detailee
MI Bar No. P74460
211 W. Fort Street, Suite 2001
Detroit, MI 48226
mitra.jafary-hariri@usdoj.gov
(313) 226-9632

 /s/ *Jamie Carter*
Jamie Carter
Assistant United States Attorney
D.C. Bar No. 1027970
555 Fourth Street, N.W.
Washington, DC 20530
Jamie.Carter@usdoj.gov
(202) 252-6741