```
                    UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF COLUMBIA

  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
UNITED STATES OF AMERICA,            )  Criminal Action
                                     )  No. 21-204-02
vs.                                  )
                                     )
ERIC CHASE TORRENS,                  )  November 6, 2021
                                     )  11:14 a.m.
                Defendant.           )  Washington, D.C.
                                     )
  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
```

**TRANSCRIPT OF SENTENCING**
**BEFORE THE HONORABLE BERYL A. HOWELL,**
**UNITED STATES DISTRICT COURT CHIEF JUDGE**

<u>**APPEARANCES**</u>:

```
FOR THE UNITED STATES: JAMIE CARTER
                       555 4th Street, NW
                       Washington, DC 20530
                       (202) 252-6741
                       Email: jamie.carter@usdoj.gov

                       MITRA JAFARY-HARIRI
                       DOJ-USAO
                       211 W. Fort Street
                       Detroit, MI 48226
                       (313) 226-9632
                       Email: mitra.jafary-hariri@usdoj.gov

FOR THE DEFENDANT:     EDWARD UNGVARSKY
                       114 North Alfred Street
                       Alexandria, VA 22314
                       (571) 207-9710
                       Email: ed@ungvarskylaw.com


ALSO PRESENT:          ROBERT WALTERS, U.S. Probation Officer
                       CHRISTINE SCHUCK, Pretrial Agent

Court Reporter:        Elizabeth Saint-Loth, RPR, FCRR
                       Official Court Reporter
```

Proceedings reported by machine shorthand, transcript
produced by computer-aided transcription.

1                          **P R O C E E D I N G S**

2                    THE COURTROOM DEPUTY:  Matter before the Court,

3      Criminal Case No. 21-204-02, United States of America versus

4      Eric Chase Torrens.

5                    Your Honor, for the record, Probation Officer

6      Robert Walters and Pretrial Agent Christine Schuck are

7      present.

8                    Counsel, please come forward and state your names

9      for the record.

10                   MS. CARTER:  AUSA Jamie Carter on behalf of the

11     United States.  We also have Mitra Jafari-Hariri who will be

12     back shortly.

13                   THE COURT:  Okay.  Good.  Thank you.

14                   MR. UNGVARSKY:  Good morning, Your Honor.

15     Edward Ungvarsky on behalf of the defendant, Eric Chase

16     Torrens.

17                   I just want to advise Your Honor that I was

18     present yesterday; so I heard, and listened, and learned.

19     And Mr. Torrens and I were present for the sentencing

20     earlier this morning to familiarize him with your sentencing

21     hearing process.

22                   THE COURT:  Okay.  Thank you.

23                   So, Mr. Ungvarsky, are you telling me that because

24     I can just skip telling him how the process is going to go?

25                   MR. UNGVARSKY:  No.  But to -- no, no.  Just to

1    advise you that we were here so that you had that

2    information to use --

3              THE COURT:  Perfect.

4              MR. UNGVARSKY:  -- however you wish to use it, in

5    any way, or not at all.

6              THE COURT:  All right.  I would expect no less,

7    Mr. Ungvarsky.

8              One of the things I try and teach my law clerks,

9    if you have a court appearance get there early so you can

10   hear what is coming before; it's usually very instructive.

11             MR. UNGVARSKY:  Yes, Your Honor.

12             THE COURT:  All right.  We're here this morning

13   for the sentencing of the defendant, Eric Chase Torrens.

14             This sentencing hearing is in person, but the

15   public access line is also being made available for persons

16   to listen to these proceedings remotely, rather than being

17   present in the courtroom.

18             Anyone listening to the sentencing hearing over

19   the public teleconference line is reminded that, under my

20   Standing Order 20-20, recording and rebroadcasting of court

21   proceedings, including those held by video conference, is

22   strictly prohibited.  Violation of these prohibitions may

23   result in sanctions, including removal of court-issued media

24   credentials, restricted or denial of entry to future

25   hearings, or any other sanctions deemed necessary by the

4

1      presiding judge.

2              All right.  So let me just start with a review of

3      all of the materials in -- that have been submitted in

4      connection with this sentencing, starting with the

5      presentence investigation report and the sentencing

6      recommendation from the probation office, docketed at

7      ECFs 107 and 108; and, then, a number of documents submitted

8      by counsel in advance of the hearing:  The sentencing memo

9      from the government, docketed at ECF 99, recommending a

10     sentence of two weeks' incarceration and $500 in

11     restitution; and, then, the government's supplemental

12     memoranda, for both this defendant and codefendant

13     Jack Griffith, on the issue of split sentences for petty

14     offenses, and some other matters, docketed at ECFs 109 and

15     117; the nine videos detailed in the government's report on

16     video of evidence re Mr. Torrens' plea, docketed at ECF 67.

17             I have also reviewed the sentencing memoranda

18     submitted on behalf of the defendant, docketed at ECF 97;

19     the supplemental sentencing information regarding the

20     defendant also addressing the issue of split offenses for

21     petty offenses, which are docketed at ECFs 101, 104, 113,

22     110, 121, and 125; the letter from the defendant, docketed

23     at ECF 97-1; and ten letters or so from his friends, family,

24     and a work supervisor, docketed at ECFs 97-3 through 97-10

25     and, also, ECF 101-1 and -2; an employment verification

```
1    letter, docketed at ECF 97-2; photographs of the defendant

2    and his daughter and, also -- perhaps a more recent

3    submission detailing all of his community service hours.

4              Is that from -- didn't you submit that,

5    Mr. Ungvarsky?

6              MR. UNGVARSKY:  Yes, I did, Judge.

7              THE COURT:  Yes.  What is that number?

8              Yes.  It's docketed at ECF 121, which I have also

9    reviewed.

10             Does the government have all of those filings?

11             MS. CARTER:  We do, Your Honor.

12             THE COURT:  And, Mr. Ungvarsky, do you have all of

13   those filings?

14             MR. UNGVARSKY:  I do, Judge.

15             I also reviewed the Pretrial Services Agency

16   compliance report that issued yesterday; I don't know what

17   the ECF number was.

18             THE COURT:  Yes.  And I have seen that.

19             MR. UNGVARSKY:  Very well.

20             THE COURT:  Okay.  So, Mr. Torrens, you were here

21   earlier today, so you heard how I do my sentencing hearings

22   in three different steps --

23             Just stand right where you are.

24             THE DEFENDANT:  Yes, ma'am.

25             THE COURT:  -- starting with a review of the
```

1   presentence report and finding out whether either side has

2   any objections to anything contained in that report; and, if

3   so, resolving those objections.

4        The second step is when I will hear from the

5   government, first; then your lawyer; and then from you, if

6   you wish to speak directly to me about sentencing in this

7   case; and then the last step requires the Court to explain

8   the reasons for the sentence, and then impose sentence.

9        So do you have any questions about what is going

10  to be happening during the course of this hearing?

11        THE DEFENDANT:  No, ma'am.  I do not.

12        THE COURT:  Okay.  Thank you.  Please be seated.

13        Okay.  Step one, presentence investigation report.

14  They were both -- the presentence report and the sentencing

15  recommendation, at 107 and 108 on the docket, were filed on

16  October 21, 2021.  And I understand that the government has

17  no objection to any of the factual or other determinations

18  set out in the PSR; is that correct?

19        MS. CARTER:  Yes, Your Honor.

20        THE COURT:  Okay.  And, Mr. Ungvarsky, have you

21  and your client read and discussed the PSR?

22        MR. UNGVARSKY:  Yes.  We have, Your Honor.

23        THE COURT:  And do you have any objections to the

24  report?

25        MR. UNGVARSKY:  We have no objections, Your Honor.

1              THE COURT:  Okay.  I saw that there were some

2      detailed in the last page of the report; but, with the

3      probation office's explanations, you are not raising those

4      objections now for a Court resolution?

5              MR. UNGVARSKY:  That's correct, Your Honor.

6              THE COURT:  Thank you.  All right.

7              Having -- hearing no objection by either side to

8      the presentence investigation report, the Court will accept

9      the factual portions of the PSR as undisputed as my findings

10     of fact at sentencing.

11             Mr. Torrens, stand right where you are, please.

12             Are you fully satisfied with your attorney in this

13     case?

14             THE DEFENDANT:  Yes, ma'am.

15             THE COURT:  And do you feel that you have had

16     enough time to talk to Mr. Ungvarsky about the presentence

17     investigation report in the case, the sentencing

18     recommendation from the probation office, and all of the

19     other papers filed in connection with your sentencing?

20             THE DEFENDANT:  Yes, ma'am.  We have had plenty of

21     time.

22             THE COURT:  Okay.  Thank you.  You may be seated.

23             THE DEFENDANT:  You're welcome.

24             THE COURT:  All right.  I will hear from the

25     government first about application of the factors set out in

1    3553(a).

2              MS. CARTER:  Thank you, Your Honor.

3              As with yesterday, we have had extensive briefing

4    in the Torrens matter as well as the Griffith matter.

5              I would just highlight something that the Court

6    mentioned during the sentencing prior to this one, which is

7    the challenge in these cases is the sheer volume of

8    defendants and trying to adequately analyze each person and

9    where they fall in the bigger picture, as the Court has

10   acknowledged the forest through the trees.

11             THE COURT:  Right.  And I -- you know,

12   particularly after the press yesterday, which is not always

13   accurately reflecting the tone of interactions between the

14   judge and counsel.

15             I don't underestimate -- you know, given the

16   thousands of people involved in the attack on the Capitol --

17   the job that the government has here; but it's also my job

18   to ask questions, and to give the government an opportunity

19   to explain why it's making certain decisions.  And I

20   think -- at least in the Court's interactions with

21   government counsel, I think you understood that that's what

22   is going on.

23             MS. CARTER:  Yes, Your Honor.

24             THE COURT:  Okay.  So -- and with respect to, as

25   you said, the massive amount of work that this investigation

 1    has taken, I think policies may evolve over time as to how

 2    different cases are going to be approached.  But I think

 3    it's incumbent on the government to articulate what those

 4    policies are because it helps judges figure out:  Do I

 5    agree, or do I not agree?  Does that sound right, or does it

 6    not sound right?  It also helps defense counsel, the defense

 7    bar, figure out how are they going to argue this -- either

 8    in open court or behind closed doors when you-all are

 9    conferring.

10          So it is also helpful to the Court to hear what

11    factors the government is considering -- as in the last case

12    where the government, you know, expressed its view that

13    somebody with a long military service should be held to a

14    higher standard, in some ways, and may warrant jail time

15    when others without that kind of military service shouldn't;

16    that's an interesting factor for the Court to hear and

17    decide:  Do I agree with that or not?  And I don't.

18          But the articulation of the factor is helpful

19    and -- also, if those factors change and policies evolve;

20    and I think that that's something that the government, you

21    know, can own up to.  And that kind of transparency is both

22    helpful to the Court, in making an evaluation of the

23    3553(a)(6) factor of avoiding unwarranted sentencing

24    disparities, and generally helpful to the defense bar and

25    how they're going to focus their conversations as well.

1              So, with that, I will let you say your peace.

2              MS. CARTER:  Yes, Your Honor.

3              I agree with the Court's statement.

4              And I actually came prepared this morning just to

5    highlight those factors specific to Mr. Torrens so that the

6    Court and everyone else will understand why we came to the

7    conclusion that we came to with regards to our

8    recommendation of two weeks.

9              THE COURT:  Which stands in such contrast to the

10   three months for his codefendant in the same case.  It's

11   like I don't even have to look through my list of, like,

12   what are people getting and what did they do to get that.

13             So, I mean, it's -- that's helpful because that's

14   the most obvious question to ask.  Why Mr. Torrens, two

15   weeks?  Mr. Griffith was standing right next to him doing

16   the same thing, and also in the Capitol Building, you know,

17   for such a short period of time; why does he get two weeks?

18             So proceed.  Why the difference?

19             MS. CARTER:  Yes, Your Honor.

20             So there are five factors that I would highlight

21   for the Court.  The first factor is the presence of -- in

22   this case, of taking photos and video outside of the

23   Capitol; and I am specifically referencing the photo that

24   was taken of Mr. Torrens and Mr. Griffith as the Capitol is

25   behind them.  It would be the lower Senate doors behind them

1    in the background; that would be the photo or video that I'm

2    specifically referencing.

3           The presence of witnessing threats against law

4    enforcement in this case, which is documented in the

5    statement that Mr. Torrens made, as well as in the video

6    which we have presented to the Court of them underneath the

7    scaffolding on the northwest stairs.

8           I would also point to -- the Court to the presence

9    of photo and video inside the Capitol.  There are two things

10   I would specifically reference; the first is as they are --

11   the video of them as they're outside and coming in through

12   that door, which was filmed by the codefendant; the second

13   which would be the photo that Torrens took of Griffith.  So

14   he is not in the photo, but he admits to taking the photo

15   inside the crypt.  The other --

16           THE COURT:  Is there something in particular about

17   those photos that should warrant jail time?

18           MS. CARTER:  So the photo taken in and of itself

19   in the midst of things is a factor for the Court to

20   consider.  But these photos in particular show that they are

21   gleeful in the face of what is going on around them; I think

22   that is a fair assessment from the extremely cheerful looks

23   on their faces that, as this riot is happening, as the

24   Capitol is being attacked, as they have seen law enforcement

25   being attacked -- not by them, but others attacking law

1    enforcement -- they have seen the tear gas, and yet they are

2    gleeful in their presence both outside and then, again,

3    inside the Capitol Building.

4         So the taking of photos and video in and of itself

5    is one part of that, but then the actual content is also

6    something I would ask the Court to consider.

7         There are two things that account for the

8    difference between Griffith and Torrens' recommendations in

9    our sentencing memorandums; those are really the

10   cooperate -- the choice to cooperate with law enforcement

11   post arrest.  In this instance, Torrens chose to give a

12   statement.  He waived his right, and chose to fully tell law

13   enforcement what he had done that day.  We give him credit

14   for that cooperative choice.

15        The second difference that I would highlight for

16   the Court is in his post-arrest behavior.  So as we

17   highlighted extensively in the Griffith memo, he continued

18   to give interviews and post, and tried to profit off of his

19   crime, which was one of the major considerations that we

20   gave when we were looking at that three-month

21   recommendation.

22        THE COURT:  Can we just talk about that for a

23   second?

24        MS. CARTER:  Yes.

25        THE COURT:  As your evolving factors are coming

 1   along, I thought I would just share my perspective on some

 2   of that.  I mean, I think I made it pretty clear yesterday,

 3   part of it; but let's just have a bit of a conversation

 4   about that.

 5          I think there is a difference between people,

 6   certainly post-arrest post-January 6th, continuing to incite

 7   political violence and divisiveness in our country by

 8   continuing to promote not only that the 2020 presidential

 9   election was stolen, but combining that with inciteful

10   language, trying to incite other people to engage in some

11   kind of activity that could amount to more political

12   violence.  People who have the view that the 2020

13   presidential election was stolen, persist in that view, even

14   express that view, is that really sufficiently dangerous on

15   its own to warrant jail time for conduct on January 6th?

16   Not that this defendant did any of that.

17          MS. CARTER:  Yes, Your Honor.

18          THE COURT:  But I think your focus, for example,

19   on Mr. Griffith, that he had post-arrest behavior that was

20   unseemingly immature and was exploitive of his status as a

21   defendant charged in connection with January 6th in order to

22   promote and sell something isn't quite the same as trying to

23   incite political violence.  And so I think there is some

24   post-arrest post-January 6th statements, speech, that would

25   be probative of the need for specific deterrence, to put it

1    in legal terms; and I will just leave it at that.

2             I didn't find Mr. Griffith's statements qualifying

3    for that, particularly given his remorse and contrition,

4    which one hopes is real at the time of sentencing.

5             But in terms of this defendant's post-arrest

6    behavior, you didn't see anything that was exhorting people

7    to continue to engage in political violence of any kind; is

8    that correct?

9             MS. CARTER:  Mr. Torrens?

10            THE COURT:  Mr. Torrens.

11            MS. CARTER:  No.

12            Mr. Griffith, I would argue the "1776" comment

13   does have that exhortation quality that judges -- that Your

14   Honor is describing, but not Mr. Torrens.

15            THE COURT:  Okay.  All right.  But because -- so

16   that's why -- so these are the two differences to explain;

17   the difference for why one recommendation was for a lot more

18   jail time than for Mr. Torrens, and the reason that Mr. --

19   the recommendation for jail time for Mr. Torrens is because

20   of the first three factors you listed; is that right?

21            MS. CARTER:  Correct.  The first three factors

22   would be applicable in both cases.  As far as the

23   cooperative post-arrest conduct and the choice to give a

24   statement, and the lack of attempts to exhort further

25   violence, then yes.

1      I would say for both of them another consideration

2 that we had was the short time inside the Capitol relative

3 to others; that applies in both cases, but the difference

4 was what the Court had focused on those.  So those would be

5 the things that I would say are different between the two;

6 the last, and the first two things that I described.

7      THE COURT:  Well, I am just going to review some

8 of the factors that I found important, just to make sure

9 that the government doesn't have anything to flesh out about

10 any of the factors that I am looking at.

11      The government agrees that this defendant -- the

12 government has no evidence that -- this defendant did not

13 engage in preplanning for an attack on the Capitol Building;

14 he brought no dangerous weapons or any defensive gear for

15 that purpose with them to the Capitol.  Is that right?

16      MS. CARTER:  Correct.

17      THE COURT:  And he was in the Capitol Building for

18 about ten minutes or less?

19      MS. CARTER:  It was around ten minutes.  I don't

20 know the exact numbers.  I don't want to tell the Court --

21 but it was around ten minutes.

22      THE COURT:  Correct, around ten minutes.

23      MS. CARTER:  Yeah.

24      THE COURT:  He did not enter any private offices

25 or rooms in the Capitol Building, and he didn't enter the

1    House or Senate chamber where members of Congress meet?

2              MS. CARTER:  Correct.

3              THE COURT:  And he did not physically attack any

4    police officer or any other person?

5              MS. CARTER:  Correct.

6              THE COURT:  And he didn't personally damage any

7    property inside the Capitol?

8              MS. CARTER:  Correct.  All of those would have

9    come with a different set of charges, correct?

10             THE COURT:  Right.  And he fully cooperated with

11   law enforcement, voluntarily gave them all asked-for details

12   concerning his conduct and who he traveled with?

13             MS. CARTER:  Correct.

14             THE COURT:  And he had no inflammatory language on

15   social media before, during, or after January 6th, let alone

16   calls for political violence?

17             MS. CARTER:  We don't have access to his social

18   media, so I have no basis in fact to offer the Court any

19   information about that.

20             THE COURT:  Okay.  But you don't have any evidence

21   as to that?

22             MS. CARTER:  No.  We have no evidence of that.

23             THE COURT:  And he promptly agreed to enter a plea

24   agreement after an offer was extended by the government?

25             MS. CARTER:  Yes.

1          THE COURT:  And would you agree that he has shown

2     remorse, embarrassment, and contrition for his criminal

3     conduct on January 6th?

4          MS. CARTER:  Yes.

5          THE COURT:  Okay.  All right.

6          And there are other people for whom the government

7     recommended either straight probation or probation with home

8     detention or people who, like this defendant, took photos

9     and videos, both outside and inside the Capitol, showing

10    that they are pretty happy to be there, right?

11         MS. CARTER:  I have numbers if the Court wants

12    them.

13         THE COURT:  Sure.

14         MS. CARTER:  So with regards to photos or videos

15    outside the Capitol, and with regards to recommendations

16    that we have made thus far -- obviously, they're still

17    ongoing -- two were probation recommendations; eight

18    received home -- I'm sorry -- four received home detention

19    recommendations; eight received jail time recommendations --

20    acknowledging that each of these factors are one factor in a

21    plethora of factors for each individual defendant --

22         THE COURT:  And what is --

23         MS. CARTER:  -- and with regards --

24         THE COURT:  Could you just explain -- I'm sorry.

25    You finish that, and I will go on to my next question.

1     Sorry.

2              MS. CARTER:  That's okay.

3              With regards to witnessing, knowing of violence or

4     threats against law enforcement, no probation

5     recommendations have been made in those cases; five home

6     detention recommendations have been made; and ten jail time

7     recommendations have been made.

8              With regards to photos or videos inside of the

9     Capitol, three probation recommendations were made; six home

10    detention recommendations were made; and ten jail time

11    recommendations were made.

12             And with regards to the short time in the Capitol,

13    which is one of the factors that weighs on the opposite end,

14    three probation, three home detention, and three jail time.

15             THE COURT:  And the factor that the government is

16    using of video or photos, either inside or outside the

17    Capitol, what is it precisely about that conduct of taking a

18    photograph that aggravates having breached the Capitol?

19             MS. CARTER:  Yes, Your Honor.

20             So I think it's twofold in my understanding.

21             The first thing that I would point out is that the

22    area that they are in when they're out there on the west

23    front, specifically in this case, that's a restricted area;

24    that's not an area where people normally are allowed to take

25    photographs.

1          I can represent to the Court, having been on

2     tours -- like, as a part of these investigations -- they

3     don't let us take photographs there without specific

4     permission for a particular case.  I know that -- my

5     understanding is that defense counsel tours have been told

6     exactly the same thing; so I think that that's relevant, one

7     point.

8          The other would be --

9          THE COURT:  And that's a security precaution?

10          MS. CARTER:  I believe so, Your Honor.  I am not,

11     obviously -- I don't work directly with the Capitol Police;

12     but I just followed what I was told.  I assume it has a

13     security reason behind it; I did not question them.

14          The other part of the larger issue I would argue

15     is, why else would you take a photograph unless you are

16     going to, like, use it in some way to either remember, or to

17     show people, to advocate for whatever you have done.  People

18     take photographs to show other people; they don't usually

19     take them and just go home.

20          It is possible that you could go home and just,

21     like, look at them in your house; but, usually, that's not

22     why in this age.  Usually people are using them to post onto

23     various social media to show their family and friends to

24     broadcast what they have done.

25          In the context of committing a crime, I do think

1    that that is significant.  Choosing to take those

2    photographs to document what you are doing shows a pride in

3    your action.  And I would argue there is an inference that

4    you are going to use that to, kind of, show everyone what

5    you have done.

6           THE COURT:  Okay.  And the witnessing of the

7    threats against law enforcement officers, so that is just

8    another -- I view that -- the fact that people saw law

9    enforcement officers being overrun, threatened, hit,

10   attacked, you know, is just another big red flag to them:

11   You shouldn't be here; but they already knew they shouldn't

12   be there.

13          MS. CARTER:  Yes.

14          THE COURT:  So how does that, as a witness to it,

15   make them an aggravator that should warrant jail time?

16          MS. CARTER:  At that point they were on notice of

17   what they were participating in; that it was no longer just:

18   We breached a barrier; which is one thing -- which is

19   definitely a crime in and of itself, to breach a barrier.

20   But we breached a barrier, and now the group that I am with

21   is attacking law enforcement physically; and I am continuing

22   to choose to remain in that group, to act as a part of it --

23   that's significant.

24          THE COURT:  Okay.  So -- all right.

25          And then your third thing was taking photos or

1    videos inside the Capitol; but that's just part of your

2    first factor, isn't it, just taking videos -- videos and

3    photos?

4           MS. CARTER:  Yes, Your Honor.

5           I would note -- in all fairness to the defense,

6    the crypt is an area that you would go on -- publicly on a

7    tour, so that would be -- the part that I was talking about

8    with the security concerns would not apply to the crypt

9    specifically.

10          THE COURT:  And people are allowed to take

11   pictures in the crypt?

12          MS. CARTER:  Correct.  Yes.

13          THE COURT:  All right.  Let me just look and see.

14          All right.  Is there anything further, Ms. Carter?

15          MS. CARTER:  No.  Thank you, Your Honor.

16          THE COURT:  All right.  Mr. Ungvarsky.

17          MR. UNGVARSKY:  Thank you, Your Honor.

18          Mr. Torrens is here before the Court on his

19   conviction of a Class B petty misdemeanor for his actions on

20   January 6th, 2021.

21          Mr. Torrens was not just a trespasser that day;

22   but he entered the Capitol as a member of an out-of-control

23   mob in which others around him engaged in violence and which

24   his presence, by being present, helped enable and contribute

25   to that.

1          I ask the Court to impose a sentence of probation

2     with general and specific conditions in light of the

3     sentencing factors of 3553(a), and the rest of 3553.

4          I first want to address nature and seriousness of

5     the offense, and that the sentence should reflect the

6     seriousness of the offense and promote respect for the law.

7          I appreciate the Court's comment from yesterday;

8     and I respect the government's position that the application

9     of this factor -- or these two factors supports

10    incarceration and that their position, from their

11    perspective, is a reasonable one.

12          And I appreciate the Court's -- I don't know if

13    you made a finding, but what I understood to be the Court's

14    finding or understanding or position that it's reasonable

15    that that -- that those factors support incarceration.

16          I also take the position that the application of

17    those factors supports probation with specific conditions as

18    I laid out in my memo.  In the memo I addressed those two

19    factors in one paragraph; and I explained how I thought --

20    and I believe this still today -- that a probationary

21    sentence with conditions which could include home

22    confinement reflects the nature and seriousness of the

23    offense and promotes respect for the law given the specific

24    conduct of Mr. Torrens within the larger conduct.

25          THE COURT:  I mean, I think -- I think the

1    government's perspective, and mine as well, is that:  Oh, my

2    goodness, you participated in a mob that's overrunning

3    police officers requiring, like, an entire branch -- an

4    entire branch of a federal government to flee.  Oh, my

5    goodness, the default should not be probation; that should

6    warrant at the outset, given the seriousness of that

7    conduct, jail time; and then you have to look at the

8    specific role of the defendants to say:  Is that necessary?

9    I think that was my point yesterday.  I think it's the point

10   that the government's been making, and that I actually agree

11   with.

12        So I am not sure we disagree, Mr. Ungvarsky; but

13   just so that you understand my position.

14        MR. UNGVARSKY:  I totally understand the Court's

15   position.  And whether I disagree or not is irrelevant

16   because you are the sentencing judge, so I just wanted to --

17   I understand it.

18        I do think that we then look at the specific --

19   the application of the other factors as well as the specific

20   application of that factor to the defendant who appears

21   before you.

22        I am not going to go at length here today orally

23   because you have gotten so much paper from us, and it's so

24   clear --

25        THE COURT:  I will say.

 1              MS. CARTER:  -- and it's so clear that you have --

 2     I mean, you have gone down to the footnotes.

 3              THE COURT:  And let me ask you, I know that in one

 4     of -- you said you have terrible back problems.  Are you

 5     comfortable?

 6              You look like you are leaning very heavily on that

 7     podium.  If you prefer to sit down and use the microphone at

 8     the table to be more comfortable, that would be fine.

 9              MR. UNGVARSKY:  This is better actually, if I may,

10     Judge.

11              THE COURT:  Okay.  Fine.

12              MR. UNGVARSKY:  Thank you, Judge.

13              So I don't want to go in -- you have clearly -- I

14     have now watched -- this is my third sentencing hearing on

15     the January 6th matter that I have watched -- one of yours.

16     And you are down in the weeds of the videos, the paperwork,

17     and the footnotes; so I am not going to go at length into

18     Mr. Torrens' background --

19              THE COURT:  Well, let me tell you, Mr. Ungvarsky,

20     I sort of -- I don't -- it was a surprise to me when I heard

21     yesterday that the government had just supplied this Court

22     with its position on the split sentence issue, which was a

23     puzzle to me; and it's a puzzle that there is not more case

24     law on it.  And your briefing, by the way, has been

25     enormously helpful as I have been trying to think through

1     the split sentence issue; and there may come a case where

2     that issue will have to be resolved by the judge.  And it

3     may resolved by me -- not in this case, and not in the case

4     yesterday -- but let me -- I did want to compliment you on

5     your briefing on that issue.

6               MR. UNGVARSKY:  Thank you.

7               THE COURT:  And it gave me a lot to think about,

8     as did the government's briefing on the issue.  And,

9     ultimately, I did not have to resolve the issue of whether a

10    split prison probation term is allowed under Section

11    3561(a)(3); but at least I now know that's a big issue.

12              My colleagues -- who also have been given a split

13    sentence in one of these January 6 cases, resolved by the

14    government with a plea to a petty offense misdemeanor --

15    have avoided giving a split sentence because they probably

16    hesitate -- given the lack of clarity in the law about

17    whether it's allowable, thereby putting the judges in the

18    position that the probation office usually serves in

19    ensuring compliance with restitution payment obligations and

20    community service obligations.

21              I don't know how my colleagues are doing that

22    because that is not their normal function; perhaps probation

23    is helping them, I am not sure.  But usually you have to

24    impose a probationary sentence or a supervision requirement

25    of some kind before the probation office is authorized to

1    provide supervision over full compliance with restitution

2    payments and community service obligations; but your

3    briefing has been helpful.

4            It's a long-winded way to say the briefing has

5    been helpful.  And it may be -- you may have another

6    opportunity to use that briefing either before another judge

7    or in front of me in the appropriate case.

8            MR. UNGVARSKY:  Thank you for that, Your Honor.

9            Frankly, it's exciting as a lawyer and, sort of,

10    surprising to come across an open issue like that, and then

11    to be able to dig into it.

12            THE COURT:  In 2021, right?

13            MR. UNGVARSKY:  Right.  I know.

14            THE COURT:  I know.

15            MR. UNGVARSKY:  I bought Scalia and Garner -- I

16    had to buy it by Amazon because they could ship it and get

17    it to me within 24 hours this week --

18            THE COURT:  Right.

19            MR. UNGVARSKY:  -- so I also have the benefit of

20    having that in the future; it turned out it's useful.

21            So Mr. Torrens' background and character -- as the

22    Court knows, he has no prior arrests.  He graduated from

23    high school; he attended some college, that didn't work.  He

24    left his home state of Florida to move to Tennessee to work.

25    And he has been working steadily and consistently there.

He is the father of a daughter whose name I am not
going to say on the public record.  And he has worked hard
to maintain 50/50 -- or have 50/50 custody of his daughter;
and he is a very good and active father.

He has family support, and he has community
support.  And what I was really struck by in the letters
that were provided to me through him -- I was struck mostly
by two letters; one was the neighbor that he lives with
who -- he helps her -- drives her places; and the second --
and her daughter plays with his daughter.  And the second I
was struck by was by his boss at his current job who talks
about how he performs his job and how he's responded to his
arrest in this matter to that boss.

I was struck by those two letters most of all
because they're not family; they don't have the inherent
bias of family.  And I think they really speak well of him.
I was also, of course, struck by -- I have talked to
Mr. Torrens many, many, many times since the court appointed
me to this case.  And I have benefitted from those
conversations in talking with someone who comes from a
different background than I do and who lives in a different
part of the country than I do; and he may have benefited
from those conversations as well.  I don't know because --
what I do know is I was struck by not just his regret, but
his remorse; they are different.

1    Regret is often -- well, my daughter might not

2    regret when I catch her doing something wrong; but I surely

3    see no remorse when I see it.

4    But Mr. Torrens, it's clear that he feels remorse

5    and shame; I think shame is a really powerful sentencing

6    effect on people.

7    Judge Bibas, now in the Third Circuit -- when he

8    was a law professor at the University of Pennsylvania, most

9    of his writings are about the value of shame in terms of

10    criminal sentencing.  And I think Mr. Torrens really feels

11    that; he feels it personally.  He feels it because his

12    family tells him that he has shamed them.  And he feels it

13    because he knows that he has shamed them; and he is going to

14    have to live with it and, at some point, explain it to his

15    daughter.

16    I don't think that specific deterrence requires an

17    incarcerative sentence for Mr. Torrens; I think that's clear

18    from his actions afterwards, and from all of the other

19    materials.

20    General deterrence -- I put in my papers my

21    position as to why I believe that one should be cautious in

22    these cases about imposing jail time for general deterrence

23    reasons because my life experience and viewpoint is that

24    sometimes it's better to spare the rod and express

25    compassion from position of authority to those -- and I am

1    not -- this isn't about -- this is general deterrence -- I

2    am not talking about Mr. Torrens -- to spare the rod and to

3    demonstrate compassion and patience to those who, for some

4    reason, start off so distrustful of motives and actions.

5          That said, I recognize that my personal view is a

6    personal view that comes from my experiences; it is not the

7    traditional viewpoint of a sentencing judge.  And I respect

8    that general deterrence is a very significant sentencing

9    factor for the Court.

10         And, of course, I am mindful of the Court's

11   obligation to avoid unwarranted sentencing disparities with

12   other defendants convicted of the same offense who are not

13   part of the same indictment number, and with Mr. Griffith

14   who was sentenced yesterday who certainly is not -- does not

15   have a more mitigating presentation to the Court than

16   Mr. Torrens, even if not more aggravating as the government

17   has suggested.

18         I ask the Court to sentence Mr. Torrens to

19   probation.  Now, he has been on pretrial -- I am going to

20   ask the Court to sentence him to a period of probation from

21   12 to 24 months.  Now, I have looked at the sentences --

22   probationary sentences that judges have given.  Some

23   defendants have gotten 36 months; some defendants have

24   gotten 24 months.  A defendant earlier this morning, in this

25   courtroom, got 24 months.  One defendant got two months;

1    that seems like a real outlier, though.  A couple of

2    defendants got sentences of 60 months; but Judge Walton told

3    them that they could always move to ask to have that

4    shortened.

5         It does appear that that's, sort of -- and I think

6    I saw -- it's in the memo I gave you; I think maybe one or

7    two defendants got 12 months.  I think that 12 months --

8         THE COURT:  Don't you think it's somewhat

9    tempting -- given what happened on January 6th, and it's

10   something that I have considered -- to have anybody who

11   participated in the riot, in the Capitol attack on

12   January 6th, who went all the way inside the Capitol

13   Building -- not just breached the grounds' perimeter, but

14   went all the way into the building -- that they be put on

15   the probation for the full five years to make sure that

16   there is no repeat performance the next time we have an

17   electoral vote count?

18        I think 36 months is what I have seen as a fairly

19   standard period of time, although five -- the full five

20   years is also a temptation.  So you can make your argument

21   about why it should be less than 36 months, but we never

22   want to see a repeat of what happened on January 6th, 2021.

23        MR. UNGVARSKY:  I understand, Your Honor.

24        I am going to start with my argument as to why it

25   should be 12 months, or in the range of 12 to 24.

1          I think that what we see, as those of us who work

2     in the criminal legal system -- we see first that when

3     problems arise on probation, they tend to occur within the

4     first year; that, after that, it tapers; we have much less

5     problems.  It's that first year of probation which is the

6     most important and valuable year.

7          Second, if someone is not doing well on probation,

8     then what ends up happening is the probation officer sends

9     in some report, and that probation either gets extended or a

10    revocation hearing starts.  So if someone is not doing well

11    on probation, they're not only going to have probation for

12    whether it's 12 months or 24 months, it's either going to

13    get extended, or the Court is going to end up having a

14    hearing potentially revoking and imposing some response.

15         So I think that when we set out these probationary

16    sentences that exceed 24 months, that it becomes excessive.

17    It becomes excessive as to time and costs for the probation

18    department to monitor the person and --

19         THE COURT:  If somebody is doing well on probation

20    after the first year and the second year, I think the

21    monitoring becomes much lighter on the probation office, and

22    it also helps ensure compliance.

23         MR. UNGVARSKY:  I concur with that, Your Honor.

24         I also am aware that people can move to make a

25    motion to request a termination of -- probation be

 1    terminated early.

 2            THE COURT:  That happens regularly.

 3            MR. UNGVARSKY:  I think, for someone like

 4    Mr. Torrens, that would be extraordinarily difficult because

 5    he is indigent.  He is not going to have the means to have

 6    counsel.  His court-appointed counsel will have concluded

 7    representation long before then, unlike the persons who were

 8    before Judge Walton last Friday who are people with means.

 9            In any event, I am requesting a 12- to 24-month

10    period of probation.

11            THE COURT:  Why is it that you can't continue to

12    represent him and just file a pro hac vice motion if I

13    transfer jurisdiction to where he is living now?

14            You can file a pro hac vice motion; you can make

15    any motion that's appropriate, and you can get paid for your

16    services.  You can just put in a CJA voucher for it in two

17    and a half years, if that's appropriate.

18            MR. UNGVARSKY:  I will say, I am happy to

19    represent Mr. Torrens in the future either by requesting a

20    Court appoint me --

21            THE COURT:  But we're getting way ahead of

22    ourselves.

23            MR. UNGVARSKY:  We're way ahead.  We're way ahead.

24    Or I would do it pro bono, I mean.

25            But I just -- I don't think that he is differently

1    situated, in terms of the record he presents before you,

2    that he will comply with probation than, for example,

3    Mr. Gruppo, from this morning, who got 24 months.  So I ask

4    for 24 months for Mr. Torrens, not 36 months.

5            In terms of home confinement, I anticipate the

6    Court will want and will impose a special condition of home

7    confinement.  I am going to ask that you -- the probation

8    department -- in its recommendation, they listed a lot of

9    exceptions, exclusions.  I am going to ask you to make sure

10   that those are clear in a couple of ways.

11           I agree with all of those exceptions, exclusions.

12   I ask the Court to make it clear that when it comes to

13   attorney visits, court appearances -- and court and other

14   obligations, that that includes not just for this court but,

15   also, for Mr. Torrens' family court matter, custody matter,

16   in Tennessee; and I can give you the name of the court if

17   you'd like.

18           THE COURT:  That's not necessary.

19           MR. UNGVARSKY:  Okay.  Because he does have

20   ongoing, and he will continue to have ongoing court and

21   legal obligations in Tennessee on a state court family

22   matter, custody matter.

23           THE COURT:  All right.  I am going to add

24   appropriate language.

25           MR. UNGVARSKY:  Thank you, Your Honor.

1          And next I would ask the Court to outline -- just

2     to make it clear that, when the exceptions include things

3     like education, medical -- that it's not just for

4     Mr. Torrens himself, but when he is the custodial parent of

5     his daughter, whose initials are V.T. -- and the Court has

6     her full name, which I can say it if the Court wants me

7     to -- so that he can take her to school, doctor's

8     appointments, and the like.

9          THE COURT:  I am just going to add appropriate

10    language.

11         MR. UNGVARSKY:  And finally, Your Honor, I ask

12    that the Court add language that permits an exception for

13    him to engage in the transfer of the custody of his daughter

14    with her mother.  You will recall from the paperwork that

15    they alternate on Sundays; it's one week on, one week off.

16    I think it's 6 p.m. on Sundays that they do a transfer and,

17    also, that they do transfers on --

18         THE DEFENDANT:  Wednesday.

19         MR. UNGVARSKY:  -- Wednesdays -- Wednesdays, like,

20    for the night.  I'd just ask the Court to allow that he be

21    able to do those transfers as part of --

22         THE COURT:  Right.  Actually, every probation

23    officer will approve that.  So the language for "other

24    activities" is preapproved by the officer.  I am confident

25    that will be approved without any necessity for me putting

1      that into the order.

2                    MR. UNGVARSKY:  Understood, Your Honor.

3                    So I don't -- I think that concludes my requests,

4      Your Honor.

5                    THE COURT:  All right.  Thank you.

6                    MR. UNGVARSKY:  Thank you.

7                    THE COURT:  Mr. Torrens, this is now your

8      opportunity to speak directly to me.

9                    THE DEFENDANT:  All right.  Thank you.

10                   I don't really do well with crowds, and stuff like

11     that, so I am just going to keep it really short.  Thanks.

12                   Good morning.

13                   I just want to say how sorry I am.  I had made a

14     bunch of mistakes that day.  I shouldn't have gone to

15     Washington for a "stop the steal" rally just to support

16     President Trump, and that was it.

17                   I shouldn't have gone to the Capitol; and, when I

18     got there, I should have left.  People were throwing things

19     at the police; it was violent, and it was chaos.  But I

20     didn't leave; and I went inside through a broken door.  I

21     shouldn't have done that; all of that was criminal.

22                   I take responsibility for my presence that day and

23     my actions that day.  I apologize for what I did.  I know

24     that I will pay for it today.  I promise myself and you that

25     you won't hear of me doing anything like that again.

1           Thank you.

2           THE COURT:  Thank you, Mr. Torrens.

3           All right.  You can just stay right where you are.

4           Mr. Ungvarsky, you can stand with your client.

5           I am going to explain the sentence I am going to

6   impose, and then I am going to impose sentence, Mr. Torrens.

7           So after considering the sentencing memoranda --

8   it's very extensive in this case -- the presentence

9   investigation report, the probation department's sentencing

10  recommendations, and hearing argument, I must now consider

11  the relevant factors set out by Congress in 18 U.S.C.

12  Section 3553(a) to ensure I impose a sentence that is -- and

13  I quote from that statute -- sufficient but not greater than

14  necessary to comply with the purposes of sentencing.  And

15  those purposes include:  The need for the sentence imposed

16  to reflect the seriousness of the offense; promote respect

17  for the law; provide just punishment for the offense; deter

18  criminal conduct; protect the public from future crimes by

19  you, Mr. Torrens; and promote rehabilitation.

20           So, in connection with assessing those factors and

21  what the appropriate sentence should be, I am required to

22  consider the nature and circumstance of the offense; the

23  history and characteristics of you, Mr. Torrens; the types

24  of sentences available; the need to avoid unwarranted

25  sentence disparities among defendants with similar records

1    found guilty of similar conduct; and the need to provide

2    restitution to any victims of the offense.

3         And I am going to begin with the restitution

4    amount owed by this defendant.  Given that the statute of

5    conviction is not covered by the two general restitution

6    statutes codified at 18 U.S.C. Section 3663 and 3663(a), the

7    Court has no authority to determine any restitution amount,

8    and is limited by what the government agrees to in the plea

9    agreement.

10        The plea agreement provides for a restitution

11   judgment of $500, which this Court will order pursuant to

12   18 U.S.C. Section 3663(a)(3).

13        Regarding the nature and circumstances of the

14   offense, as I mentioned yesterday, in your sentencing memo

15   where you said that courts sentence the offender, not the

16   offense; that's not precisely correct.

17        Sentencing must be particularized to each

18   defendant, but Congress has mandated that the Court must

19   consider the nature and circumstances of the offense, as

20   well as ensure that the sentence imposed sufficiently

21   reflects the seriousness of the offense; promotes respect

22   for the law; and provides just punishment for the offense,

23   among other relevant factors.  So these statutory factors do

24   make it a must that the sentencing court consider far more

25   than just the history and certain characteristics of the

1      individual defendant offender.  The seriousness of the

2      offense conduct, the harm that it caused, must be

3      considered.

4           I am not going to go into detail describing the

5      nature and circumstances of the offense conduct on

6      January 6th, other than to say what I have said before; that

7      the rioters attacking the U.S. Capitol on January 6th, as

8      part of a large mob, were not mere trespassers engaged in

9      protected First Amendment protest, and they certainly were

10     not tourists.

11          As countless videos make clear, the mob attacking

12     the Capitol on January 6th, as Mr. Torrens has himself

13     pointed out -- it was violent; they were attacking police

14     officers trying to protect the building from being breached

15     and protecting the people inside of it from being harmed;

16     that includes the entire legislative branch of the federal

17     government, and two Vice Presidents -- Vice President Harris

18     who was there, and Vice President Pence.

19          As the government points out, the defendant

20     himself recognized it seemed like people in the crowd were

21     antagonizing or trying to, like, get a riot going, which

22     they did.  But even seeing that, Mr. Torrens didn't stop.

23     He didn't turn around; he didn't leave.  He didn't try to

24     stop others from attacking the police and breaking into the

25     Capitol.  As he says, he made all those mistakes himself.

1    He kept going.  He entered the Capitol through a

2    door that had been broken in, with an alarm blaring; and he

3    spent about ten minutes in the Capitol Building before

4    exiting; taking the time to take at least one photo with his

5    codefendant and friend to commemorate the experience.

6    Mr. Torrens did celebrate his actions.  He was

7    smiling; he was taking videos.  He was screaming:  We're

8    going in, as he and his codefendants entered the Capitol.

9    He certainly took advantage of the opportunity presented by

10   this mob to overwhelm the police lines and enter the

11   Capitol.

12   And I have already detailed what the harm was,

13   both to the members of Congress, Vice Presidents who were

14   inside, and also, basically, to the shocked nation and the

15   world watching these events unfold.

16   There are many people who believe that any person

17   who participated in that mob, who set foot inside the

18   Capitol Building, should simply go to jail.  And Congress

19   could pass a law requiring a mandatory jail term of a

20   minimum amount for offense conduct like that which occurred

21   on January 6th, and then federal judges like me would do

22   their best to apply that law fairly; but that is not the law

23   I must apply here.

24   I am required by the law, in 18 U.S.C. Section

25   3553(a), to, quote:  Impose a sentence sufficient but not

1    greater than necessary to comply with the purposes of

2    sentencing.

3              And among the factors that I look at, in assessing

4    the defendant's role in this overall mob action, and

5    whether -- the government's recommendation of two weeks'

6    incarceration, are the following factors and considerations:

7              This defendant was in the Capitol Building for

8    about ten minutes.  He didn't physically attack any police

9    officer or other person; he didn't personally damage any

10   property inside the Capitol.  He didn't engage in chants or

11   slogans or carry posters or signs or brandish a weapon of

12   any kind to incite others to follow him into the Capitol.

13             He posted no inflammatory language on social media

14   before -- or that there is evidence of -- before, during, or

15   after January 6th calling on people to join the mob on

16   January 6th, let alone any calls for political violence.  He

17   doesn't appear to have engaged in any preplanning or

18   preparations for participating in violent confrontations on

19   January 6th.  He brought with him no dangerous weapons, or

20   even defensive gear for participating in any kind of

21   confrontation.

22             He fully cooperated with law enforcement after his

23   arrest.  He promptly agreed to enter a plea agreement and

24   accept responsibility for his criminal conduct after an

25   offer was extended by the government.  He has expressed his

1     shame and his remorse, and accepted responsibility for his

2     criminal conduct that day.  He acknowledged he knows he

3     shouldn't have entered the Capitol.

4              So, in sum, although the nature and circumstances

5     of the overall offense, and the need for the sentence to

6     reflect the seriousness of the offense and promote respect

7     for the law would generally favor a custodial sentence, the

8     particular circumstances of this defendant's conduct put him

9     in a less troublesome category than other more aggressive

10    rioters that day, and particularly given his lack of

11    criminal history -- which I am going to go into next -- the

12    need for specific deterrence is lessened -- less of a

13    concern for this Court.

14             Regarding the defendant's history and

15    characteristics -- as I said, he has no criminal history.

16    He has earned his high school diploma; he's taken several

17    college courses.  He has a steady history of employment, and

18    he is fully employed; and he has partial custody of his

19    daughter.  He does have a history of substance abuse, but

20    has sought, even recently, counseling and medical assistance

21    to combat his addictions.

22             His conduct after the Capitol attack appears to

23    show a sincere acceptance of responsibility and remorse for

24    his actions, as I have said.  He spoke voluntarily with the

25    FBI.  At the time of his arrest, he admitted his conduct;

1   freely disclosed all of the relevant details concerning how

2   he got to D.C., who he traveled with, what he saw, and what

3   he did.  He has been compliant with his release conditions.

4        He is -- in addition to taking responsibility for

5   his conduct through a guilty plea, he also included a

6   personal statement describing his conduct and his remorse in

7   the presentence investigation report and in a subsequent

8   letter to the Court.

9        Unlike other January 6th defendants, including

10   those for whom the government has recommended probation or a

11   probationary period with some home detention, he didn't post

12   any pictures of his time in the Capitol Building on social

13   media and didn't boast about his criminal conduct to try and

14   incite people to continue some form of political violence or

15   advocate -- didn't appear to advocate for overturning a

16   legitimate electoral process; and he didn't even appear to

17   downplay the seriousness of his actions on January 6th.

18        Instead, he's expressed his apology -- and I

19   quote:  To the Congress members and the people inside the

20   Capitol Building, stating:  They must have felt threatened

21   and been afraid of what was happening, and all of the people

22   in the mob.  He even apologized to the prosecutor s who have

23   had to deal with these crimes that we made on January 6th --

24   that's a quote.  And he's begun volunteering on the weekends

25   to help contribute to his community and country in the wake

1    of the damage his actions caused.

2             Every single letter submitted on defendant's

3    behalf demonstrates that he hasn't attempted to retract his

4    remorse or downplay the seriousness of his criminal conduct

5    on January 6th, and that he has the support of his family

6    and his community, not just for something that he needs --

7    not just for himself, but for the sake of his daughter.

8             The need for the sentence imposed to deter

9    criminal behavior and protect the public from further crimes

10   of the defendant are critical considerations for every

11   sentencing judge; and the seriousness of the criminal

12   conduct witnessed on January 6th only highlights the need

13   for deterrence in the form of a sufficient sentence to deter

14   the defendant and others from engaging in this kind of

15   conduct in the future.

16            For numerous individuals like the defendant, who

17   got caught up in the fervor of the crowd, it's also

18   necessary for this Court to make clear that a lack of

19   forethought and planning does not absolve people of criminal

20   activity on January 6th, especially when their participation

21   facilitates and amplifies the blatant and egregious criminal

22   conduct of many others who did turn violent.  There are

23   consequences to going along with the crowd, a mob, when that

24   mob is engaging in clear and obvious criminal conduct.

25            As I said, the Court does not find the need for

44

1    specific deterrence for this defendant that would favor a

2    custodial sentence in light of his lack of criminal history;

3    his lack of violent conduct during the offense; his lack of

4    any promotion of his criminal activity to promote any kind

5    of political violence; his cooperation; early acceptance of

6    responsibility; and the fact that a disruption of his job

7    when he doesn't make that much money to begin with, would

8    not be helpful to him in maintaining his family.

9         Regarding the types of sentences available:  The

10   defendant was convicted of a petty Class B misdemeanor, so

11   he's subject to a maximum term of imprisonment of six months

12   and, also, up to five years' probation.

13        I am not going to get into the debate about

14   whether he may also be subject to a split sentence, which is

15   a matter that has taken up a lot of briefing in this case.

16   And it is, sort of, this unusual situation, as was made

17   clear in the sentencing of this defendant's codefendant

18   yesterday, that even though the government takes the

19   position that a split sentence is allowable for a petty

20   offense, under 18 U.S.C. Section 3561(a)(3), the government

21   hasn't recommended a split sentence for any petty offense

22   conviction in this case, with this defendant or his

23   codefendant, or in any other January 6th-related case.

24        So this is a very highly unusual position for the

25   government in a case where the government is requesting

1    restitution payments, since a probation period provides

2    supervision to ensure a defendant pays up in full; and,

3    thus, whenever there is a restitution requirement as part of

4    sentencing, the government normally demands a period of

5    supervision to ensure full compliance.  So this is a very

6    unusual situation.  But I am not going to resolve that

7    debate, that legal issue here, as tempting as it might be --

8    and as good as the briefing is from both sides on the issue

9    because there is no necessity to given the planned sentence

10   that I think is warranted in this case.

11          Regarding the need to avoid unwarranted sentencing

12   disparity, the defendant raises the fact that other

13   January 6th defendants charged with petty offense

14   misdemeanors have received probationary sentences, and

15   suggests that a custodial sentence here would be an

16   unwarranted sentencing disparity; and given the specific

17   facts related to this defendant's offense conduct on

18   January 6th, I do agree and believe that a sentence of

19   probation with a period of home detention would be

20   appropriate, specifically because of the absence of any

21   preplanning or coordination by the defendant prior to coming

22   to Washington, D.C. from Tennessee, prior to entering the

23   Capitol Building; the absence of any violent conduct during

24   the offense by the defendant; the absence of any damage,

25   theft, or incitement of damage by the defendant; his brief

1    time of only approximately ten minutes inside the Capitol

2    Building; his decision not to enter any private offices or

3    spaces in the building; his lack of promotion or incitement

4    on social media or any statements before, during, or after

5    of trying to encourage others to engage in similar mob

6    activity that would provoke political violence; his lack of

7    criminal history; his early acceptance of responsibility;

8    his cooperation; his expression of contrition and remorse

9    all weigh in favor of a sentence of probation here.

10            So based on my consideration of these and other

11   factors, I will now state the sentence to be imposed.

12            Pursuant to the Sentencing Reform Act of 1984, and

13   in consideration of the provisions of 18 U.S.C.

14   Section 3553, it is the judgment of the Court that you,

15   Eric Chase Torrens, are hereby sentenced to a term of 36

16   months, or three years, of probation as to Count 5 of the

17   information filed against you -- no -- it is an indictment

18   in this case.

19            In addition, you are ordered to pay a special

20   assessment of $10, in accordance with 18 U.S.C.

21   Section 3013.

22            While on supervision, you shall abide by the

23   following mandatory conditions, as well as the standard

24   conditions of supervision, which are imposed to establish

25   the basic expectations for your conduct while on

1  supervision.

2          The mandatory conditions include:  One, you must

3  not commit another federal, state, or local crime; two, you

4  must not unlawfully possess a controlled substance; three,

5  you must refrain from any unlawful use of a controlled

6  substance; you must submit to one drug test within 15 days

7  of placement on supervision, and at least two periodic drug

8  tests thereafter, as determined by the Court; and, four, you

9  must make restitution in accordance with your plea agreement

10  under 18 U.S.C. Section 3663.

11          I just want to remind you, Mr. Torrens, I don't

12  know what the law is regarding marijuana in the state where

13  you reside, but marijuana is still a controlled substance

14  under federal law.  So even if your friends are using

15  marijuana because it may be legal where you live, it is

16  illegal; it is a controlled substance under federal law.

17  And while you are on your probationary period, do not use

18  marijuana.

19          THE DEFENDANT:  Yes, ma'am.

20          THE COURT:  The Court authorizes supervision and

21  jurisdiction in this case to be transferred to the U.S.

22  District Court for the Middle District of Tennessee.

23          You shall comply with the following special

24  conditions:

25          You are ordered to make restitution to the

1    Architect of the Capitol in the amount of $500.

2         The Court determined you do not have the ability

3    to pay interest and, therefore, waives any interest or

4    penalties that may accrue on the balance.

5         You must pay the balance of any restitution owed

6    at the rate of no less than $25 each month.  You must pay

7    the financial penalty in accordance with the schedule of

8    payments sheet of the judgment.  You must also notify the

9    Court of any changes and economic circumstances that might

10   affect the ability to pay this financial penalty.

11        Having assessed the defendant's ability to pay,

12   payment of the total criminal monetary penalties is due as

13   follows:  Payment in equal monthly installments of $25 over

14   a period of 20 months to commence after the date of this

15   judgment.

16        You must provide the probation officer access to

17   any requested financial information and authorize the

18   release of any financial information until the restitution

19   obligation is paid in full; the probation office may share

20   financial information with the U.S. Attorney's Office.

21        You must not incur any new credit charges or open

22   additional lines of credit without the approval of the

23   probation officer.

24        You will be monitored by the form of location

25   monitoring technology indicated to run for a period of 90

1    days in home detention.  You must follow the rules and

2    regulations of the location monitoring program; the cost of

3    the program is waived.  Location monitoring technology is at

4    the discretion of the probation officer, including:  Radio

5    frequency monitoring, GPS monitoring, including hybrid GPS,

6    SmartLINK or voice recognition.  This form of location

7    monitoring technology will be used to monitor the following

8    restriction on your movement in the community:

9         You are restricted to your residence at all times,

10   except for your own or your daughter's employment,

11   education, religious services, medical, substance abuse or

12   mental health treatment, attorney visits, court appearances,

13   court-ordered obligations for -- in connection with any

14   judicial proceeding or family judicial matters, or other

15   activities as preapproved by the probation officer.

16        Restitution payments shall be made to the Clerk of

17   the Court for the U.S. District Court, District of Columbia,

18   for disbursement to the following victim in the amount of

19   $500:  Architect of the Capitol, Office of the Chief

20   Financial Officer, attention Kathy Sherrill, CPA, Ford House

21   Office Building, Room H2-205B, Washington, D.C. 20515.

22        The Court finds you do not have the ability to pay

23   a fine and, therefore, waives imposition of a fine in this

24   case.  The financial obligations are immediately payable to

25   the Clerk of the Court for the U.S. District Court, 333

1    Constitution Avenue, Northwest, Washington, D.C. 20001.

2              Within 30 days of any change of address, you shall

3    notify the Clerk of the Court of the change until such time

4    as the financial obligation is paid in full.

5              The probation office shall release the presentence

6    investigation report to all appropriate agencies, which

7    includes the U.S. Probation Office in the approved district

8    of residence, in order to execute the sentence of the Court.

9    Treatment agencies shall return the presentence report to

10   the probation office upon the defendant's completion or

11   termination from treatment.

12             Pursuant to 18 U.S.C. Section 3742, you have the

13   right to appeal the sentence imposed by the Court if the

14   period of imprisonment is longer than the statutory maximum.

15   If you choose to appeal, you must file any appeal within 14

16   days after the Court enters judgment.

17             As defined in 28 U.S.C. Section 2255, you also

18   have the right to challenge the conviction entered or

19   sentence imposed if new and currently unavailable

20   information becomes available to you or on a claim that you

21   received ineffective assistance of counsel in entering a

22   plea of guilty to the offense of conviction or in connection

23   with sentencing.  If you are unable to afford the cost of an

24   appeal, you may request permission from the Court to file an

25   appeal without cost to you.

1           Are there any objections to the sentence imposed

2      not already noted, for the record, from the government?

3           MS. CARTER:  No objection, Your Honor.

4           I do have one brief factual correction.

5           The government recently learned that Vice

6      President Harris was in the building in the morning and in

7      the building when Congress reconvened, but not actually in

8      the building during the riot itself.

9           THE COURT:  Interesting.  I didn't know that.

10          MS. CARTER:  There were protected persons that

11     were present, but not Vice President Harris.  Just in case

12     that weighs in any way, I wanted the Court to know that.

13          THE COURT:  It doesn't.  It doesn't.

14          No.  It doesn't change anything I have said,

15     except thank you for that correction.

16          MS. CARTER:  Yes, Your Honor.

17          THE COURT:  I thought she was there as part of the

18     Senate at that point still.

19          MS. CARTER:  Yes, Your Honor.

20          THE COURT:  All right.  Any objection not already

21     noted on the record?

22          MR. UNGVARSKY:  No objection from the defense,

23     Your Honor.

24          THE COURT:  All right.  You may be seated.

25          Does the government have a motion to dismiss the

1      open counts?

2               MS. CARTER:  Yes, Your Honor.

3               We move to dismiss Counts 2, 3, and 4 with regards

4      to Mr. Torrens.

5               THE COURT:  And that motion is granted.

6               Does the government have anything else today?

7               MS. CARTER:  No, Your Honor.

8               THE COURT:  And Mr. Ungvarsky?

9               MR. UNGVARSKY:  Not from the defense.

10              Thank you, Your Honor.

11              THE COURT:  All right.  You are all excused.

12              PROBATION OFFICER:  Your Honor, if I may ask

13     permission again, just for the record, that he can be placed

14     on location monitoring when he gets to Tennessee?

15              THE COURT:  Absolutely.  Yes.  Thank you very

16     much.

17              PROBATION OFFICER:  Thank you.
                (Whereupon, the proceeding concludes, 12:25 p.m.)

18                            **CERTIFICATE**

19              I, ELIZABETH SAINT-LOTH, RPR, FCRR, do hereby

20     certify that the foregoing constitutes a true and accurate
       transcript of my stenographic notes, and is a full, true,

21     and complete transcript of the proceedings to the best of my
       ability.

22              This certificate shall be considered null and void
       if the transcript is disassembled and/or photocopied in any

23     manner by any party without authorization of the signatory
       below.

24
                Dated this 8th day of November, 2021.

25              /s/ Elizabeth Saint-Loth, RPR, FCRR
                Official Court Reporter